## ANNA MAE JONES *v.* STATE OF MARYLAND

[No. 269, September Term, 1979.]

*Decided December 17, 1979.*

The cause was submitted on briefs to MOYLAN, LOWE and MACDANIEL, JJ.

Submitted by *Richard M. Karceski* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Diane G. Goldsmith, Assistant Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *John Prevas, Assistant State's Attorney for Baltimore City,* for appellee.

LOWE, J., delivered the opinion of the Court. MOYLAN, J., filed a concurring opinion at page 430 *infra.*

There is seldom any difficulty in interpreting the holdings of an appellate court. The enticement of vaticinating beyond that necessary to decide the case before such court is, however, that which causes lawyers to become prophets instead of interpreters of the law. Dictum, like the road to Avernus, is easily traversed but the way back is hard to find.

In *Bell v. State,* 41 Md. App. 89 (1979), this Court was

affirmed in its holding by the Court of Appeals, *Bell v. State,* 286 Md. 193 (1979), which held, as did we, that when a mistrial caused by extreme prosecutorial negligence is declared upon a defendant's request, the Double Jeopardy Clause is not offended by a second prosecution. We differed, however, in our unnecessarily expansive language on what cause for mistrial would bar a retrial.

Our hariolation divined from the Supreme Court's "teachings" was that misconduct of a prosecutor (or judge) intended to force a defendant to move for, or consent to, a mistrial was the sole exception to the general rule that the Double Jeopardy Clause is not offended by a second prosecution when a mistrial is declared upon the request, or with the consent, of a defendant.

Forced to expand, because of our dicta, upon an hypothesis not before them, the Court of Appeals added that the bar to retrial would be raised whether the prosecutorial (or judicial) misconduct was intended to abort the trial *or* to "[prejudice the defendant's] prospects for an acquittal if the trial continued to a verdict." *Id.* at 204-05. Explaining its broadening of our finer line, the Court pointed out that:

> "It is 'bad faith conduct by judge or prosecutor' with such intent that prohibits retrials.
>
> The keystone of the test formulated and consistently followed by the Supreme Court is the requirement of 'intent.' And intent is implicit in 'bad faith.' " *Id.* at 205 (footnote omitted).

The courts of general and special appeals both arrived at these divergent results after interpreting the same Supreme Court cases and finding "clear teachings" therein. Apparently the Court of Appeals was influenced by both the deterrent effect a prohibited retrial would have upon an overzealous prosecutor, and the consistency of punishing "bad faith" misconduct (regardless of the specific intent). On the other hand, we were concerned more with the practical consequences of such an expansive interpretation; *i.e.,* a) the societal concern of granting an accused immunity from

prosecution, as prosecutorial punishment, notwithstanding guilt or innocence of the accused, b) the consequence to the accused of the diminution of the zealousness with which a trial judge may guard against prosecutorial improprieties by granting a mistrial at defendants' request when the effect of doing so would be to dismiss the case, and c) the inconsistent consequence of granting retrials after reversals but not after mistrials. See *United States v. Tateo,* 377 U.S. 463, 466 (1964); see also *Tabbs v. State,* 43 Md. App. 20 (1979).

Our dicta, which troubled the Court of Appeals and led to its response, now moves forward apace giving rise to one of the problems we sought to avoid. We are called upon by appellant to bar a retrial in the Criminal Court of Baltimore of Anna Mae Jones, whose conviction for drug violations we overturned for prosecutorial misconduct which we found so grievous and prejudicial that it constituted a "denial of due process". In violation of a pretrial agreement, the prosecution intentionally introduced evidence-of-evidence which it had expressly agreed not to introduce.

Before trial, appellant had sought discovery of a notebook containing highly prejudicial writings which was seized at the apartment of a codefendant not then on trial. The notebook appears to have been lost by the State before trial and, therefore, relying upon the State's agreement that

" . . . we were not going to use the notebook because we didn't have the notebook",

appellant withdrew her motion for production. See per curiam opinion, *Jones v. State* (No. 737, September Term, 1977, filed March 16, 1978) appended, pp. 5-6.

When the case was being tried, appellant scored substantially on cross-examination of an officer testifying as to a search of premises of a codefendant. The officer was forced to admit he found no "narcotics, . . . cutting materials, lactose, dextrose, [or] any type of materials of that nature" in the search. Seeing its case substantially weakened, the State, on redirect, commenced its rehabilitative inquiry by asking whether the officer found "any evidence of narcotic dealings."

At a bench conference following a timely objection, the State's agreement was brought to the court's attention by appellant's attorney who strenuously sought to enforce the agreement:

> "This is a dangerous area, dangerous thin ice as far as the defense is concerned with reference to that book. I mean, we would move and think we would be entitled to mistrial if there is any reference to that book, reference to . . .
>
> THE COURT: Why would you think so?
>
> MR. SMITH [Defense Counsel]: Because of what we discussed pre-trial. There is some prejudicial material in that and they can't find it and we can show it was not our defendant's book."

We acknowledge that there is but a technical difference when a trial judge recognizes prosecutorial misconduct intended to prejudice accused's prospects for acquittal by granting a mistrial (*e.g., Bell, supra*), and when such judge should have either excluded the evidence or granted a mistrial, and is reversed for having permitted the prejudicial evidence improperly elicited to prejudice appellant's prospect for acquittal.

We have difficulty distinguishing why one retrial should be barred and another permitted when an accused "faced with the 'Hobson's choice' of continuing with the trial or requesting or consenting to a mistrial", *Bell, supra,* at 203, decides to continue rather than move to abort. Indeed the distinction is even less when the decision is left to the judge. The cause, as well as the effect, is the same in either case. The cause is the "bad faith conduct" of the prosecutor with the "intent" of "prejudicing [appellant's] prospects for an acquittal [when] the trial continued to a verdict", which "intent . . . implicit in 'bad faith' " is the "keystone of the test formulated and consistently followed by the Supreme Court . . . ." *Id.* at 205. The effect (or objective), *i.e.,* to avoid "the anxiety, expense, and delay occasioned by multiple prosecutions,' " *id.* at 203 (quoting *United States v. Dinitz,* 424 U.S. 600, 608 (1976)), is also the same.

Although the Court of Appeals' reasoning in *Bell* may be correct,[1] our reasoning and decision in that case was influenced by Mr. Justice Harlan in *United States v. Tateo, supra* at 465.

> "The Fifth Amendment provides that no 'person [shall] be subject for the same offence to be twice put in jeopardy of life or limb . . . .' The principle that this provision does not preclude the Government's retrying a defendant whose conviction is set aside because of an error in the proceedings leading to conviction is a well-established part of our constitutional jurisprudence. In this respect we differ from the practice obtaining in England. The rule in this country was explicitly stated in United States v. Ball, 163 US 662, 671-672, 41 L ed 300, 303, 16 S Ct 1192, a case in which defendants were reindicted after this Court had found the original indictment to be defective. It has been followed in a variety of circumstances; see, e.g., Stroud v United States, 251 US 15, 64 L ed 103, 40 S Ct 50 (after conviction reversed because of confession of error); Bryan v United States, 338 US 552, 94 L ed 335, 70 S Ct 317 (after conviction reversed because of insufficient evidence); Forman v United States, 361 US 416, 4 L ed 2d 412, 80 S Ct 481 (after original conviction reversed for error in instructions to the jury)."

*Tateo* itself was a case in which a defendant was coerced into entering a guilty plea on the fourth day of trial by a trial judge who observed that if Tateo was found guilty, he would impose inordinate sentences upon him.

Our *Bell* decision was based on *Tateo.* We saw then, and see now, very little difference between a trial judge granting a mistrial because there might be a miscarriage of justice due to prosecutorial misconduct and an appellate court granting a new trial because there might have been a miscarriage of

---

1. And it is correct unless that Court of last resort chooses to reconsider its own decision.

justice due to prosecutorial misconduct. It seemed that if Justice Harlan's concern that appellate courts would less zealously protect

"against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution", *id.* at 466,

so then might trial judges look with doubtful zeal at such protections upon a defendant's motion for mistrial based upon prosecutorial misconduct.

Although we were found to be wrong in assuming the Supreme Court would apply the *Tateo* reasoning to avoid a double jeopardy bar of a retrial of a case *mistried* because of prosecutorial misconduct, we can find no justification for barring a retrial of a case concluded, but *reversed* because of prosecutorial misconduct. As recently as June 14, 1978, the Supreme Court has held that but for evidentiary insufficiency a person can be tried a second time for an offense when his conviction for that offense has been set aside by his appeal. *Burks v. United States,* 437 U.S. 1 (1978). The Supreme Court, through its Chief Justice, explained its reasoning, even alluding to prosecutorial misconduct as an example of error causing reversal which would not bar a retrial.

"Various rationales have been advanced to support the policy of allowing retrial to correct trial error, but in our view the most reasonable justification is that advanced by Tateo, supra, at 466, 12 L Ed 2d 448, 84 S Ct 1587:

'It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.'

See Wilson, supra, at 343-344, n 11, 43 L Ed 2d 232, 95 S Ct 1013; Wade v Hunter, 336 US 684, 688-689, 93 L Ed 974, 69 S Ct 834 (1949). In short, reversal for trial error, as distinguished from evidentiary

insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, incorrect instructions, *or prosecutorial misconduct.* When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished. See Note, Double Jeopardy: A New Trial After Appellate Reversal for Insufficient Evidence, 31 U Chi L Rev 365, 370 (1964)." *Id.* at 15 (emphasis added and footnote omitted).

We cannot coalesce *Bell, supra,* with the Supreme Court's reasoning or with our result here. We must choose.

Although the language that concerns us in *Bell* is dicta which does not bind us, it is dicta so strong that we would feel compelled to follow it under apposite facts. The compulsion to adhere notwithstanding, we are neither obliged nor persuaded to expand it. We are, on the other hand, compelled to follow "clear" holdings of the Supreme Court, as we are of the Court of Appeals, and both Courts indicate that evidentiary insufficiency is the *only* cause of reversal that will bar retrial after conviction. *Burks, supra; Mackall v. State,* 283 Md. 100 (1978). As indicated in *Tateo* and emphasized in *Burks,* the sanction of dismissal of an accused for any defect is "a high price indeed for society to pay . . . ." *E.g., Johnson v. State,* 282 Md. 314 (1978); *State v. Hicks,* 285 Md. 310 (1979). When we have a choice, we are not inclined to extract that price unless constitutionally compelled to do so.

*Judgments affirmed.*
*Costs to be paid by the appellant.*

424

APPENDIX:

UNREPORTED

*IN THE COURT OF SPECIAL APPEALS*

*OF MARYLAND*

No. 737

September Term, 1977

---

ANNA MAE JONES

v.

STATE OF MARYLAND

---

Gilbert, C.J.,
Liss,
Couch,
JJ.

---

Per Curiam

---

Filed: March 16, 1978

*Per Curiam*

In this appeal, Anna Mae Jones asks that we set aside the

judgments of the Criminal Court of Baltimore in which appellant was convicted of four (4) Controlled Dangerous Substances Laws violations and sentenced to a total of forty (40) years imprisonment.

Mrs. Jones fires a virtual shotgun blast at the judgments, consisting of eleven (11) attacks on their validity. The first six (6) issues were heard in a consolidated case. Those contentions were decided adversely to Mrs. Jones in Part II of *Poore v. State*, 39 Md. App. 44, 384 A.2d 103 (1978). We see no reason to repeat what we said in *Poore,* and we incorporate the holdings therein by reference thereto just as if they were fully set forth *infra.*

The overall factual pattern from which this appeal, along with its siblings, arose is detailed in *Poore, supra.* We shall not repeat it. Additional facts that may be pertinent will be alluded to in this opinion.

We focus our attention on the tenth assigned error. Appellant therein asserted:

> "It was prejudicial error to permit police officers to testify as to the contents of a missing or destroyed notebook, over objection of the defense, where: (1) the notebook was lost or destroyed while in the State's custody; (2) it was impossible for the defense to inspect the original notebook; (3) *the State, prior to and during the trial, denied that it would elicit testimony about the notebook;* (4) *the State was permitted to elicit such testimony on redirect examination even though the notebook had not been referred to on either direct or cross-examination;* (5) the notebook was never authenticated; (6) the evidence was not admissible under any exception to the hearsay rule; (7) there was no evidence that the notebook belonged to the appellant; (8) the State conceded that the writing in the notebook was not the appellant's; and (9) the probative value of the testimony was outweighed by its prejudice." (Emphasis supplied.)

During the course of the trial, the State called Corporal Fred A. Settle of the Maryland State Police as its witness. Settle testified that on March 9, 1976, he executed a search and seizure warrant at 12 Cedar Heights Circle in Baltimore County. The purpose of the search "was to sieze [*sic*] any controlled dangerous substance, money, lists, slips and records pertaining to any controlled dangerous substance trafficing [*sic*] or illegal activity carried on there." Corporal Settle's "Inventory/Return" discloses, and his testimony verified, that he seized nine (9) items of jewelry consisting of four (4) women's and five (5) men's rings, $36,103 in currency of the United States that was stashed in two (2) principal places, eleven thousand plus dollars in a safe, and $24,000 under a carpet, one (1) address notebook, two (2) telephone statements, a rental agreement and miscellaneous papers. The rental agreement was in the name of Anna Mae Jones, the appellant. Various articles of clothing, both male and female types, were observed in closets of the apartment. Mrs. Jones established ownership to six (6) of the rings, and they were returned to her. The trooper said that "[t]he others were stolen." An objection to that response was "sustained." [1]

On cross-examination, Settle was asked, "Did you find any narcotics on the premises?" He answered, "I did — I did not sieze [*sic*] anything I thought was not narcotics." Patently, dissatisfied with that non-responsive reply, counsel persisted by asking, "What you described is what you siezed [*sic*]?" The trooper replied, "Yes." The defense attorney then asked, "And there were no narcotics in that group?" Settle said, "No, it was not." After some interrogation concerning the money and the presence of a hospital bed on the premises, the officer was queried as to "any cutting materials, lactose, dextrose, any type of materials of that nature" found in the search. The answer was in the negative as was the response to whether "glassine bags" were found.

The State, on redirect began inquiry into whether Settle found "any evidence of narcotic dealings." Following a

---

1. No further action was requested or taken.

prompt objection, a bench conference ensued. Appellant's attorney maintained that:

"This is a dangerous area, dangerous thin ice as far as the defense is concerned with reference to that book. I mean, we would move and think we would be entitled to mistrial if there is any reference to that book, reference to . . ."

The transcript continues:

"THE COURT: Why would you think so?

MR. SMITH [Defense Counsel]: Because of what we discussed pre-trial. There is some prejudicial material in that and they can't find it and we can show it was not our defendant's book.

MR. DENHOLM: [Assistant State's Attorney]: We never said it was your defendant's book. I just said it was a book found with some numbers and writing. That's — and the State was not — the State had no intention of bringing this out, which it did not on its direct examination but the picture was framed for the jury on cross examination, that question, money was found, but no drugs were found. So, consequently, there was no narcotic violations [*sic*] found at this premise.

Now, I'm asking, was there any evidence that would indicate narcotic transactions were going on at that premises. No — I don't know if any was found. I do not know how the fact that a lost book, which indicated names and addresses, I assume, and narcotic transactions would not be relevant in response to those questions that he, the defense asked."

After ascertaining out of the presence of the jury that the "notebook" was "lost," the judge allowed Corporal Charles English to relate to the jury what the notebook contained. Prior thereto, Mr. Denholm acknowledged to the judge that "the State did in fact — say we were not going to use the notebook because we didn't have the notebook."

Corporal English said that "if my memory serves me correct," the notebook was "[f]ive [inches] by eight [inches]. Something like that." He further stated, "[o]ne page in particular that we used in the ex parte was — at the top of the page was the word written in clear, legible ink, heroin. . . . The middle part of that page, they had the numbers 75 and right next to it they had the word glassine bags." At the bottom of the page, "is like a sentence where it was heroin, ten bags a day at ten dollars a bag, four bags." Later he added, "four bags cost thirty-eight hundred." There were "no money signs next to that."

Relying upon his memory, Corporal English declared that another page read, "heroin, 18 glassine bags of white powder, one hundred and eighty dollars." He was interrupted by the court with a request that he slow down his rate of speech, and then he uttered, "[i]t also read two large glassine bags of white powder, 31 grams . . . and it had five hundred dollars next to that."

The State suggests to us that the objection was not directed toward the questions now posed to us, and that even if they be construed by this Court to be before us properly, the admission of the content of the notebook is harmless error beyond a reasonable doubt under *Dorsey v. State,* 276 Md. 638 (1976), as cumulative.

Underpinning this controversy is the factual predicate that the appellant's attorneys filed discovery proceedings in which they sought the production of the notebook. We glean from the record that in consideration of the State's representation that it was not going to use the notebook or allude to it, the defense withdrew its motion. We so glean because that was the allegation at trial and here. It has not been denied. We are confronted then with an issue of basic fairness that must be considered in the light of Mr. Smith's cross-examination of Corporal Settle.

Why the State would agree as it did, except that it had a mental reservation to evade its seemingly clear commitment, we are left to guess. The appellant's attorney argued strenuously before the trial judge that he had built the defense of his client on the strength of the State's

commitment, knowing full well that no narcotics were found in the apartment at 12 Cedar Heights Circle. The allowing of the State to withdraw unilaterally from its promise and to produce the evidence that it had agreed not to use was absolutely devastating to the defense. They were unprepared for such action by the State.

We cannot agree with the trial judge that the cross-examination in some way opened the door to the State's breach of its agreement not to use or refer to the lost notebook. The defense's pointing out that no narcotics, cutting agents or glassine bags were found in the premises does not permit the State to show by redirect evidence that other indicia of narcotic trafficking was found in the apartment, by introducing into evidence the very thing they had expressly agreed not to introduce.

We think the State's overt breach of its commitment constitutes a denial of due process of law. The phrase "due process of law" as Mr. Justice Holmes said in *Frank v. Mangum,* 237 U.S. 309, 347 (1915), "embraces the fundamental conception of a fair trial. . . ." There is no fair trial when guile is the cornerstone.

It may well be that the Assistant State's Attorney did not mean to bind the State in the manner that he did, but they were so bound and must abide by the agreement. To hold otherwise would not only deny the appellant the fair trial to which she is entitled, but would make the phrase "due process of law" meaningless as applied to this case.

Moreover, we are unable to hold that the error was harmless beyond a reasonable doubt. While, in our view, there was ample evidence for the jury to find the appellant guilty as charged, even without the overkill use of the notebook, we are uncertain as to what effect the content of the notebook, with its reference to heroin, had upon the minds of the jury. In any event, we are unprepared to declare the introduction and consideration of that evidence harmless beyond a reasonable doubt.

We reverse the case and remand it for a new trial. In view

of our disposition on this issue, we need not decide the remaining questions.

*Judgments reversed.*
*Case remanded for a new trial.*
*Costs to be paid by Mayor and City*
*Council of Baltimore.*

*Moylan, J., concurring:*

I join the judgment of the Court. I must, however, respectfully demur to the attendant dicta, for I see the majority opinion tilting at windmills. Were the dragon it perceives real, I would enlist at the barricades within the hour. I take issue not with its response to the imagined hazard but with its very perception that the hazard is there.

At the outset, let the entire tempest be viewed in the realistic perspective of the teapot wherein we thunder. My dicta differs with the majority's dicta in our respective interpretations of the dicta of Judge Orth in *Bell v. State,* 286 Md. 193 (1979), wherein he interpreted the dicta of the Supreme Court in *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); and *United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978). Why have all three courts never issued a square holding on the problem of "overreaching"? Because we are dealing with a subtle distinction wrapped in a mere nuance surrounding a metaphysical nicety. Yet the effort is commendable for the dicta involved, at all of these levels, is no mere passing turn of phrase but considered and thoughtful analysis. This is such stuff as doctrine is made of, as opposed to mere case-by-case *ad hocery.* Indeed, the judgment of comparative jurisprudence has been that the Anglo-American common law has been too prone just to decide cases and not resolute enough at building an internally consistent body of doctrine. I therefore applaud the effort of the majority, with which I disagree, even as I applaud the effort of Judge Orth, with which I wholeheartedly agree. And so, to the disagreement.

Let us begin with the recognition that every appellate reversal of a conviction, properly granted, is predicated upon a finding of error. Most declarations of mistrial, properly granted, are predicated upon a finding of error. In both instances, the error has been prejudicial to the defendant; that is, more than harmless. The behavior by prosecutor or judge, moreover, which is deemed erroneous has been, 99% of the time, advertent and not accidental. There is, therefore, nothing talismanic in talking about "intentional conduct by prosecutor or judge denying a defendant due process of law." The normal remedy for such error — of a quality eroding the right of a defendant to a fair trial and, thereby, depriving him of constitutional due process of law — is the affording to him of a new trial, hopefully free of error and hopefully reaching a proper verdict upon the merits. The sanction applied to an error-ridden trial is to wipe it out and begin again. The far more extreme sanction, available only in the mistrial-retrial context, of wiping it out and sometimes not beginning again is of an entirely different order and is not aimed at the correction of simply intentional trial conduct which is determined to have been erroneous. The majority and I are both agreed on this. I do not read Judge Orth as retreating from this. The majority apparently does.

One small corner of the crowded double jeopardy field is that dealing with the permissibility of a retrial following the declaration of a mistrial. This concern was not historically a part of double jeopardy law at all but a separate common law tradition, guarding the right of the defendant to stay with a tribunal until a verdict had been rendered. Over the years, this distinct procedural protection was engrafted uncritically upon the constitutional law of double jeopardy. *Crist v. Bretz,* 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978) (dissenting opinion by Powell, J.). That misbegotten merger is the source of much latter-day confusion.

When a mistrial is declared upon the motion of the State or by the court *sua sponte,* over the objection or without the consent of the defendant, a retrial will be barred unless there was a manifest necessity for the declaration of the mistrial. A substantial body of laws now exists as to this aspect of the

mistrial-retrial problem. A less explored aspect of the problem is that governing the situations where the mistrial has been declared at the request of, or with the consent of, the defendant. Ordinarily, such request or consent would operate as an essential waiver of any subsequent double jeopardy claim. Solely by way of dicta, the Supreme Court has indicated that a limitation upon this foreclosure would be the situation wherein the defendant was left with no real choice in the matter because of "prosecutorial or judicial overreaching." This dicta has generated the discussion now in issue as to what is precisely the "prosecutorial or judicial overreaching" that will bar a retrial following the declaration of a mistrial at the request of a defendant.

The answer can only be found within the context of the interest being guarded by this distinct body of procedural protection. That interest is not the protection of the defendant from an erroneous conviction. An appellate reversal following conviction or a declaration of mistrial, either followed by a permitted retrial, has traditionally safeguarded defendants from erroneous convictions. The very different interest guarded by this particular common law tradition has been the defendant's option to stay with a tribunal which may be favorably disposed to his cause and not to have the State deliberately abort a trial which the State senses is going badly. It is not the harmful effect of an error as such but rather the peculiar *mens rea* with which the error is committed which is of overriding significance in this context.

The sensitivity to this distinction was what led this Court in *Tabbs v. State,* 43 Md. App. 20, 403 A.2d 796 (1979), and in *Bell v. State,* 41 Md. App. 89, 395 A.3d 1200 (1979), to lay to rest the ghost of the notion that gross negligence on the part of prosecutor or judge could ever constitute such overreaching. The Court of Appeals expressly affirmed this conclusion in *Bell v. State, supra.* In his opinion for the Court of Appeals, Judge Orth made it very clear that only intentional conduct can qualify as overreaching. Thus far, everyone seems to be in agreement. The metaphysical nicety has been handled with aplomb.

We move to the subtle distinction within the metaphysical

nicety. What is the quality of intent which makes the commission of error "intentional" within this particular context. It is not the mere intentional doing of the trial action, which action is later ruled to have been erroneous. That is the mere *general intent* to do the deed. The general intent to do the action, which is later determined to be a foul, is almost always present. Inflammatory jury arguments are intentionally spoken and are not mere Freudian slips of the tongue. Prejudicial questions or the introduction of tainted evidence represent conscious and intended actions. The law of "overreaching," on the other hand, contemplates a *specific intent* above and beyond the mere general intent. It involves not the mere intentional striking of a blow which turns out to be a "foul" but rather the intentional and deliberate commission of a "foul", knowing it to be such. To be guilty of "bad faith," one must have the specific intent deliberately to commit error and not simply the general intent deliberately to do an action which is determined to be error. This is my reading of the law and it is my reading of what Judge Orth said in *Bell.* I believe that the majority has failed to perceive that Judge Orth is steadfast in this regard because it has misread the nuance yet to be discussed as an erosion of this position and not a mere nuance upon it. On, therefore, to the nuance upon this subtle distinction!

All are agreed that the ancient evil giving birth to this body of law, and the present evil still being guarded against, is the effort on the part of government to sabotage a trial which is going badly in order to improve its chances for conviction upon some later occasion. In our earlier efforts to articulate this in *Bell* and *Tabbs,* we failed to distinguish between the specific intent to sabotage the trial which was going badly and the mere mechanism by which that sabotage was to be accomplished. We spoke of the necessity, for "overreaching" purposes, of the prosecutor or judge deliberately sabotaging the trial with the hope of forcing the defendant to ask for a mistrial. Judge Orth has gone us one better by adding the refinement that the mechanisms of sabotage may be plural. The specific intent must still be to sabotage the trial by committing a deliberate foul. Once having done that, the

prosecutor or the judge may be wantonly indifferent to whether 1) the defendant requests and obtains a mistrial or 2) the trial goes forward and the prosecution obtains a victory it could not have obtained but for the deliberate foul. The foul has accomplished its purpose by either means. This is all I perceive the refinement to be. I believe the majority reads it overbroadly to be an erosion of the specific intent to sabotage a doubtful trial.

I also believe that the majority's concern with the analogy between the retrial-following-mistrial situation and the retrial-following-appellate-reversal situation stems from our ill-advised effort to cram two divergent legal traditions into a single Procrustean mold. When a defendant is forced by overreaching to request a mistrial and the mistrial is declared, his right to stay with that tribunal has been infringed. When, upon the other hand, the trial has gone full term, even when a mistrial has been requested and erroneously denied, different considerations obtain. The right to stay with the original tribunal was not infringed, even if under the circumstances it should have been. The appellate review of the conviction looks at the error in terms of its impact upon the ultimate verdict and does not look at the now-moot question of whether the mistrial which was not granted should have been granted. In that context, we are governed by the philosophy of *United States v. Tateo,* 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964), and the law according to *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).