## ANNA MAE JONES *v.* STATE OF MARYLAND

[No. 7, September Term, 1980.]

*Decided October 14, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Richard M. Karceski* for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

In her effort to avoid a second trial on charges of conspiracy to distribute heroin and possession of heroin with intent to distribute, Anna Mae Jones seeks to have us hold that the error which caused the Court of Special Appeals to direct a new trial after her conviction was such that yet another trial is forbidden under the Double Jeopardy Clause of U. S. Const. amend. V.

We shall affirm the decision of the Court of Special Appeals in *Jones v. State,* 44 Md. App. 417, 409 A.2d 725 (1979), which held to the contrary.

Mrs. Jones was convicted by a jury in the Criminal Court of Baltimore.

Apparently, Mrs. Jones and some of her associates were

the target of an extensive investigation. An order for a tap of her telephone was obtained.[1] The recorded conversations introduced at trial between Mrs. Jones, Raymond Fortune, and others concerned the possession, distribution, and sale of heroin. She was arrested immediately after the last recorded conversation. At that time she had nearly $8,000 in cash on her person.

The controversy here involves in part search of an apartment in Baltimore County. (This is not the apartment where the telephone was maintained.) The apartment was leased in the name of Mrs. Jones. A search warrant was procured. Fruits of that search included a lease in the name of Mrs. Jones, miscellaneous papers, and more than $35,000 in secreted cash. Apparently a notebook seized at this time was lost. In response to a motion made pursuant to Maryland Rule 741 b 5 for permission to inspect and copy it, the State indicated it did not intend to use this material at trial.

Yet another search warrant was issued and executed pertaining to premises said to be those of Raymond Fortune. Substantial quantities of controlled dangerous substances and paraphernalia were seized.

The trial opened with the introduction of the wiretap evidence. The State's expert identified Mrs. Jones' code name. He interpreted for the jury the jargon used. As interpreted, it disclosed the substantial involvement of Mrs. Jones with heroin traffic.

Fortune testified that he had known Mrs. Jones all of his life, that the narcotics seized from his home had been received from her on consignment on approximately May 1, 1976, that he had been engaged in narcotics transactions with her since about October of 1974 or 1975, and that prior to May 1, 1976, he had been receiving an average of ten ounces of heroin a month from Mrs. Jones, paying her about $16,000 for it.

The controversy which produces this appeal arose from the testimony of Corporal Fred Settle of the Maryland State

---

1. The agreed statement of facts in this case states that the electronic surveillance was upheld in Poore v. State, 39 Md. App. 44, 384 A.2d 103, *cert. denied,* 282 Md. 737 (1978).

Police, the second witness called. On the day of Mrs. Jones' arrest he executed a search and seizure warrant at the apartment leased in her name in Baltimore County. On direct examination he related his purpose in searching the premises, the finding of the lease in Mrs. Jones' name, the secreted money and various miscellaneous papers. On cross-examination he was specifically asked whether he found any narcotics during the search. He said that he did not. He was then asked whether he found "any cutting materials, lactose, dextrose, any type of materials of that nature at the apartment?" He answered in the negative to that question and to one as to whether he found any glassine bags. Then redirect examination was begun by the assistant State's attorney, Mr. Denholm. The record reflects:

Q. Relative to this case, sir, how many times were you involved in surveillance or had knowledge of surveillance of 12 Cedar Heights apartment?

A. Approximately twelve or fifteen.

Q. Twelve or fifteen times. Now, when you executed the search and seizure warrant at 12 Cedar Heights on March 9th, 1976, did you find any evidence of narcotic dealings —

MR. SMITH: Objection.

MR. DENHOLM: — at the premises of 12 Cedar Heights?

THE COURT: Sustained.

MR. DENHOLM: May we approach the bench one moment, Your Honor.

THE COURT: Yes.

(Whereupon the following proceedings were had at the bench, out of the hearing of the jury:)

MR. DENHOLM: Your Honor, the reason —

THE COURT: Where are you going —

MR. SMITH: This is a dangerous area, dangerous thin ice as far as the defense is concerned with reference to that book. I mean, we would move and think we would be entitled to mistrial if there is any reference to that book, reference to —

THE COURT: Why would you think so?

MR. SMITH: Because of what we discussed pre-trial. There is some prejudicial material in that and they can't find it and we can show it and we can show it was not our defendant's book.

MR. DENHOLM: We never said it was your defendant's book. I just said it was a book found with some numbers and writing. That's — and the State was not — the State had no intention of bringing this out, which it did not on its direct examination but the picture was framed for the jury on cross examination, that question, money was found, but no drugs were found. So, consequently, there was no narcotic violations found at this premise.

Now, I'm asking, was there any evidence that would indicate narcotic transactions were going on at that premises. No — I don't know if any was found. I do not know how the fact that a lost book, which indicated names and addresses, I assume, and narcotic transactions would not be relevant in response to those questions that he, the defense asked.

THE COURT: Well, I think we'll have to ask those questions out of the presence of the jury, then. You certainly can bring in a book if there is a sufficient explanation of the loss, but that has to be determined.

MR. SMITH: Your Honor, the State does not need this book. This book has the word heroin in it. I can show you exactly what the book contained based on what they gave us pretrial. It's an extremely prejudicial piece of evidence.

MR. BELSKY: We asked for it.

THE COURT: If you have seen the book pretrial —

MR. SMITH: I have not seen the book, I have seen the summary of what they say is in the book.

THE COURT: I'm going to find out what happened to the book before I decide on whether evidence regarding it is admissible.

Out of the presence of the jury, the court was engaged for the remainder of that afternoon and all of the following morning in taking testimony relative to the circumstances surrounding the loss of the notebook and hearing argument as to whether testimony should be permitted concerning its contents. Ultimately, the testimony was ruled admissible. The trial judge observed in pertinent part:

Now, certainly, if the book existed, it would be admissible in evidence. The defense would have an opportunity to look at it and do whatever they wished with regard to getting the information that it would provide.

They would presumably, with this in the evidence, they would have to take certain action to counteract it in some way by way of defense. That presumably would be in various forms, by witnesses who would say that the defendant did not live at the house, that someone else also lived in the house, that it did not belong to the defendant. . . .

This would be available today as far as verbal testimony is concerned as it would have had the book been in evidence. The only thing that the defense could not do was to have the handwriting of the notes made, analyzed, to determine whether or not the defendant herself wrote the article, items in this book. That would be the only thing. There would be other available ways to counteract that evidence.

Now, the question is whether or not the fact that it cannot be analyzed is such prejudice as to prevent the introduction of this testimonial evidence concerning that book or not.

The Court feels that it can be qualified; that there is no evidence as to the handwriting as to the person

who wrote it and other evidence still is available to answer it. The Court does not, and thinks that it would be unfair to the State not to be able to put in the evidence involved, just as it would be unfair to the defendants not to put in the fact that nothing was found on May the 5th, which they wish to do and which they are going to be permitted to do, because the Court feels that all relevant evidence should be before the jury for its consideration.

Corporal Settle described the book and what it contained. He then stated in response to a question as to what he recalled relative to its contents:

To the best of my recollection, it was written on there the word heroin, 75 glassine bags, ten bags a day at ten dollars a day. There was — I think it was 16 bags of white powder at, I believe, it was $180. There was another notation about white powder amounting to 31 grams. That's about all I can remember from the pages.

Mrs. Jones appealed her conviction to the Court of Special Appeals. It reversed in an unreported opinion, saying it "th[ought] the State's overt breach of its commitment constitute[d] a denial of due process of law." [2] The case was remanded to the trial court for a new trial. Upon the remand a motion to dismiss was filed contending that retrial would violate the double jeopardy provisions of U. S. Const. amend. V. That motion was denied. The Court of Special Appeals affirmed. We then granted the writ of certiorari to consider the issue raised.

As Judge Gray said for the Court in *Moquin v. State,* 216 Md 524, 527, 140 A.2d 914 (1958), citing 4 *Blackstone's Commentaries* 335 (Lewis Ed. (1898) at 1725-26), the doctrine of double jeopardy is one of ancient origin. At common law a plea of *autrefois acquit* or *autrefois convict* was a good

---

[2]. The opinion, although originally unreported, is reproduced as an appendix in Jones v. State, 44 Md. App. 417, 424, 409 A.2d 725, 729 (1979). No application for the writ of certiorari was made to us in the first case. Thus, that decision of the Court of Special Appeals becomes the law of the case.

defense. *Ex parte Lange,* 85 U.S. (18 Wall.) 163, 169, 21 L. Ed. 872 (1874). As a part of the common law it has been the law of Maryland since July 4, 1776, by virtue of Maryland Declaration of Rights, Art. 5. Obviously, this was a number of years before the adoption of the Constitution of the United States. The doctrine was recognized in Maryland at least as far back as *State v. Sutton,* 4 Gill 494, 498 (1846). See also *Anderson v. State,* 86 Md. 479, 481-82, 38 A. 937 (1897), and *State v. Shields,* 49 Md. 301, 303 (1878). However, it is the double jeopardy provision of U. S. Const. amend. V, made applicable to the states by *Benton v. Maryland,* 395 U.S. 784, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969), through U. S. Const. amend. XIV, with which we are here concerned.

Jones here concedes that thus far in only two types of situations has the Supreme Court held that an individual may not be retried after the reversal of a conviction on appeal. The first was in *Green v. United States,* 355 U.S. 184, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957). There a man indicted for first degree murder was found guilty by a jury of second degree murder. Its verdict was silent on the charge of first degree murder. The conviction was reversed on appeal. The Court held that the second trial of him "for first degree murder was contrary to both the letter and spirit of the Fifth Amendment." *Id.* at 198. The second such holding came in the more recent case of *Burks v. United States,* 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978). It held "that the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient . . . ." *Id.* at 18. Otherwise, the Court has adhered to the view expressed by it in *United States v. Ball,* 163 U.S. 662, 16 S. Ct. 1192, 41 L. Ed. 300 (1896), that a defendant who successfully challenges his conviction may be retried by a court of competent jurisdiction, the rationale being that the defendant wiped the slate clean and the parties may start anew. See the discussion of *Ball* by Judge Cole for this Court in *Parks v. State,* 287 Md. 11, 15, 410 A.2d 597 (1980), and the yet more recent discussion by Judge Eldridge for the Court in *Sweetwine v. State,* 288 Md. 199, 204-07, 421 A.2d 60 (1980).

Mrs. Jones here seeks to carve out a third exception to *Ball* arguing that the breach of the agreement here would have justified the grant of a motion for a mistrial and that, since this would have been on the basis of prosecutorial overreaching, the retrial is barred by the Double Jeopardy Clause. We shall assume arguendo for the purpose of our discussion here that such an exception exists.

In *Bell v. State,* 286 Md. 193, 201-05, 406 A.2d 909 (1979), Judge Orth discussed for the Court the concept that the Double Jeopardy Clause might bar retrial of an individual after a mistrial declared as a result of prosecutorial misconduct. He said in conclusion:

> The teaching of the Supreme Court cases is clear. Retrial is not barred as violative of the Double Jeopardy Clause of the Fifth Amendment when a mistrial is declared at the behest or with the consent of the defendant unless such error or misconduct, sufficient to justify the declaration of a mistrial, was committed by either the prosecutor or the court with the intention of (1) forcing the defendant to move for or consent to a mistrial, or (2) prejudicing his prospects for an acquittal if the trial continued to a verdict. It is "bad faith conduct by judge or prosecutor" with such intent that prohibits retrials.
>
> The keystone of the test formulated and consistently followed by the Supreme Court is the requirement of "intent." And intent is implicit in "bad faith." Thus, the test does not encompass negligence. *See Illinois v. Sommerville,* 410 U.S. 458, 93 S. Ct. 1066 (1973). "Intentional" and "negligent" are mutually exclusive. It is true that the greater degree of negligence, the closer the error comes to being intentional. That is, an error by judge or prosecutor which appears to be "gross negligence" may, of course, provide some evidence of intent. But if what seems to be negligent is so gross as to warrant a determination that the act was in fact intentional, it is not then "negligent." [*Id.* 204-05.]

In *Bell* we concluded that the retrial of the accused was permissible, stating:

> When the errors alleged in the defendant's motion for a mistrial are considered, there is no sufficient indication that they were committed by the prosecution with the intention of forcing Mrs. Bell to seek a mistrial or to prevent an acquittal at the trial under way. The trial court expressly did *"not* find that the State's Attorney wanted or *deliberately* sought a mistrial." Although it was satisfied that the matters necessitating the mistrial were the result of prosecutorial error and negligence (gross negligence with respect to failure to disclose the entire plea bargain with Mason), it was "not satisfied that the conduct of the prosecution was motivated by bad faith or was with the deliberate intent of harassing the accused or of seeking a more favorable opportunity to secure a conviction." Our review of the record leads us to the same conclusion. [*Id.* at 205-06 (emphasis in original).]

The matter of prosecutorial misconduct in the setting of a mistrial is briefly discussed by J. Cook, *Constitutional Rights of the Accused: Post-Trial Rights* § 61 (1976):

> The lower courts have generally found official misconduct to be accidental or unintended and have permitted reprosecution of the accused. Such has been the case where the misconduct occurred at an early stage of the trial before an acquittal seemed imminent where the prosecution had elicited inadmissible evidence at trial, made unflattering remarks about the accused before the jury or opposed the mistrial. On the other hand, deliberate misconduct has been found where the prosecution insisted that the accused stand trial without counsel, requested the withdrawal of a juror, or referred to other criminal charges pending against the accused. [*Id.* at 148-49.]

In *Bell* in n.8 at 205 the Court pointed out that the Court of Special Appeals had noticed the concept that gross negligence is a variety of judicial and prosecutorial overreaching in *Thompson v. State,* 38 Md. App. 499, 381 A.2d 704 (1978), indicated disfavor with it in *Loveless v. State,* 39 Md. App. 563, 387 A.2d 311 (1978), and *Whitfield v. State,* 42 Md. App. 107, 400 A.2d 772 (1979), and expressly rejected it in *Bell v. State,* 41 Md. App. 89, 101, 395 A.2d 1200 (1979), and *Tabbs v. State,* 43 Md. App. 20, 49, 403 A.2d 796, *cert. denied,* 286 Md. 754 (1979).

Some guidance in what might constitute prosecutorial misconduct or overreaching may be found from an examination of cases in other jurisdictions. Examples of what other courts have found to be misconduct barring a retrial are found in *United States v. Martin,* 561 F.2d 135 (8th Cir. 1977); *United States v. Kessler,* 530 F.2d 1246 (5th Cir. 1976); *United States v. Broderick,* 425 F. Supp. 93 (S.D. Fla. 1977); and *People v. Pendleton,* 75 Ill. App. 3d 580, 394 N.E.2d 496 (1979).

A motion in limine was made in *Martin* to prohibit the Government's attorney from reading to the jury as substantive evidence the grand jury testimony of the accused. The motion was denied upon the assurance that the irrelevant statements contained in the testimony had been excluded. The trial judge granted a motion for mistrial after the reading, however. The Eighth Circuit said what took place "was more than mere prosecutorial negligence." *Id.* 561 F.2d at 139. In holding the Double Jeopardy Clause barred another trial, the court said:

> It is readily apparent that improper and prejudicial remarks made by grand jurors were read to the trial jury. In addition improper and prejudicial remarks made by the prosecutors were read to the jury. The record is replete with instances where the defendant was interrupted in his answers or was not given an opportunity to answer. In addition, at one point the prosecutor in effect testified by answering a question posed by a grand juror. If the

government's actions in reading this irrelevant and highly prejudicial testimony to the jury were not intentionally designed to provoke a mistrial request, at a minimum they constitute gross negligence. It can best be described as prosecutorial error undertaken to harass or prejudice the defendant — prosecutorial overreaching. [*Id.* 561 F.2d at 140.]

In *Kessler* the accused was on trial for criminal conspiracy to export arms and ammunition and criminal attempt to export a military explosive. The Government, over objection and on the basis of inadmissible hearsay declarations, introduced into evidence an automatic rifle which had no known nexus with the alleged conspiracy and which was not an example of arms supposedly involved in the alleged conspiracy. A motion for mistrial was granted. The trial judge said that much of this evidence was admitted on the basis of its being subsequently connected with the conspiracy and that the statements ordinarily would not have been admitted. The court said in holding that further prosecution was barred under the Double Jeopardy Clause:

[T]he prosecution knew that the AR-180 had no known nexus with the alleged conspiracy and that it was not "an example" of the arms supposedly involved in the alleged conspiracy. Nevertheless, the Government chose to introduce this AR-180 into evidence on the known false basis that it was "an example" of the arms involved in the alleged conspiracy. [*Id.* 530 F.2d at 1257.]

In *Broderick* at the beginning of trial and out of the presence of the jury the defense asked for a ruling on a potentially troublesome hearsay problem. The prosecution indicated it had no knowledge of the statement and would not go into it, which was ratified by the court. Nevertheless, in the opening statement reference to this hearsay evidence was made. A motion for mistrial was denied upon the representation of the prosecution that the statement was

made in the presence of the defendant and was not, therefore, hearsay. On the second day of trial the prosecutor, without requesting a bench conference or giving any indication of her intent to do so, elicited the hearsay statement from the last Government witness to testify. When questioned by the court she indicated that she had done some research and had concluded that the statement was "qualified hearsay." A motion for mistrial was granted. The court observed:

> [T]he prosecutor triggered the mistrial through intentional misconduct. The prosecutor says that through over night research, she became convinced that the statement was admissible in evidence. If this is true, the problem could have been entirely avoided by arguing her position again and obtaining a ruling from the court. She chose instead to deliberately ask the witness the prohibited question in the presence of the jury. In so doing the prosecutor invited the mistrial. [*Id.* 425 F. Supp. at 97.]

Further prosecution was held to be barred by the Double Jeopardy Clause.

In *Pendleton* a witness was much more explicit in her response on cross-examination on a Monday morning than she had been on the preceding Friday afternoon. It developed that there had been an extended conference between her and representatives of the prosecution in the interim. A mistrial was declared. It was pointed out that at the time of the recess on Friday "the prosecution's case was going badly," that its representatives were "acutely aware that based upon Friday's testimony, the State m[ight] have failed to prove a *prima facie* case against a number of the defendants because of the complainant's complete and often times disastrous inability to identify her alleged attackers," but when the trial reconvened she "positively, conclusively and unhesitatingly identified the defendants as the men who had

allegedly raped her." *Id.* 75 Ill. App. 3d at 595. The court said:

> There was no legitimate need for the assistant state's attorney to meet with the complainant and to intensively review and discuss the complainant's previous testimony. We reject the State's claim that such a conference was necessary to calm the complainant down. There were other less suspect ways available to relieve the complainant of her nervousness; ways which would not have posed such an inviting potential for prosecutorial manipulation. [*Id.* 75 Ill. App. 3d at 595.]

\* \* \*

> We find that the prosecutorial misconduct at the defendants' first trial, which precipitated the mistrial declaration, constituted overreaching and acts as a bar to the defendants' reprosecution. [*Id.* at 597].

Cases in other jurisdictions where no misconduct barring a retrial has been found include *United States v. Romano,* 482 F.2d 1183, 1187-88 (5th Cir. 1973); *United States ex rel. Montgomery v. Brierley,* 414 F.2d 552 (3d Cir. 1969); *White v. State,* 523 P.2d 428 (Alaska 1974); *Torres v. State,* 519 P.2d 788 (Alaska 1974); *Muller v. State,* 478 P.2d 822 (Alaska 1971); *City of Tucson v. Valencia,* 21 Ariz. App. 148, 517 P.2d 106 (1974); *People v. Baca,* 193 Colo. 9, 562 P.2d 411 (1977); *State v. Baylor,* 2 Kan. App. 2d 722, 587 P.2d 343 (1979); *State v. Wesley,* 347 So. 2d 217, 219 (La. 1977); and *Commonwealth v. Wright,* 439 Pa. 198, 266 A.2d 651 (1970).

In *Brierley* a mistrial in a case involving charges of murder, arson, robbery and burglary had been granted when the prosecutor referred to the accused as a "pro" and as an "old pro." Retrial was held not barred by the double jeopardy rule.

In *White* a mistrial was granted because of what was termed "the incurably prejudicial impact of . . . tenuous

evidence of [drug] addiction . . . ." Retrial was held not barred with its being said, "The prosecutor's behavior in eliciting this testimony falls far short of the deliberate misconduct required to prevent reprosecution with a new jury." *Id.* at 429.

*Torres* concerned prosecution for lewd and lascivious conduct upon the person of an 8-year-old girl. The prosecutor in his opening statement referred to previous contacts by the accused involving the prosecuting witness and her sister. A motion for mistrial was granted. The court said the review of the transcript did not "reveal any prosecutorial misconduct designed to avoid an acquittal upon recognition that the state's case was going badly." *Id.* 519 P.2d at 791.

As a condition to consolidation of trials in *Muller* there had been a ruling that the state might not use a statement said to have been made to police by one defendant. In his opening statement, "the prosecutor, evidently unaware of the previous ruling of the court, made reference to the statements which had been obtained . . . ." *Id.* 478 P.2d at 825. A mistrial was declared. The court said that the prosecutor's remarks "f[e]ll far short of evidencing the requisite element of intentional misconduct." *Id.* 478 P.2d at 827.

In *Valencia* separate trials were to be held on each of the two offenses with which an accused was charged. Before one trial it was directed that no testimony pertaining to the other charge would be admitted before the jury. When the first witness was called he was asked if he could identify the accused. In response he indicated that the defendant had given two different names, thus involving the second charge of giving false information to a police officer. A motion for mistrial was granted. The court said that even if it be assumed that the prosecutor was negligent, "it does not rise to the level of intentional misconduct designed to avoid an acquittal which is required before defendant can invoke double jeopardy after moving for a mistrial." *Id.* 517 P.2d at 110.

In *Baca* at the first trial the prosecutor called a witness in

rebuttal and sought to obtain certain testimony from her regarding an attempt by the defendant to persuade her to commit perjury. At an in camera hearing the prosecutor was advised as to the proper method and the foundation which was necessary to secure the testimony of the witness. He said he would proceed on that basis but instead he released the witness. A motion for mistrial was granted "because of the inferences and inuendos obvious in the District Attorney's questioning of the witness." *Id.* 193 Colo. at 11. The .court said, "There is no basis in the record for showing that the prosecution was attempting to save its case for another day by triggering a mistrial." *Id.* 193 Colo. at 14.

In *Baylor* the prosecutor said in closing argument:

> Based upon the evidence, based upon your own common sense, the law that's given to you, you have two choices. If you think that Mr. Baylor is not guilty, you can find him such and we will all go about our ways. Mr. Baylor will go his and we will go ours; or you can find him guilty as charged and make a dent in a heroin community of Topeka. [*Id.* 2 Kan. App. at 724.]

The court said:

> Defendant makes no showing that the prosecutor's closing remarks exhibited intent or motivation to provoke defendant's motion for mistrial. There is nothing to indicate that the trial was going badly and that the prosecutor made the prejudicial remarks hoping to obtain a chance to bring defendant to trial a second time. [*Id.* 2 Kan. App. at 725.]

In *Wright* in a burglary prosecution the trial judge first ruled the prior criminal record of the accused admissible in the form in which it was presented. He reversed that decision overnight. Thereafter, the prosecutor, "out-of-context of his previous questions," advised the court he wished "to offer into evidence the record of th[e] defendant consisting of six burglaries." A mistrial was granted. The trial judge was satisfied, however, that the remarks of the prosecutor

leading to the mistrial were not made for the purpose of achieving a second chance to try a weak case. *Id.* 439 Pa. at 204. The Supreme Court of Pennsylvania observed:

> Determining the motives of the prosecutor is quite similar to deciding a question of the credibility of a witness. The trial judge who is on the scene and who has observed the individuals and the events is in a better position to decide this question than are we who have only a dry record from which to work although we recognize that even for the trial judge this is a difficult task. [*Id.* 439 Pa. at 204.]

It pointed out that the record supported the trial court's finding that the Commonwealth's evidence at the first trial was strong and persuasive. Hence, it found no abuse of discretion in the "finding that there was no intent on the prosecutor to cause the mistrial intentionally so that he could try again under more favorable circumstances to obtain a conviction." *Id.* 439 Pa. at 205.

Under none of the holdings in the cases we have reviewed would what took place here constitute misconduct barring a second trial had there been a mistrial granted. It seems to us that the contention of Mrs. Jones that she would have been entitled to the grant of a motion for mistrial is far-fetched. Be that as it may, if we assume arguendo that she would have been entitled to the grant of such a motion, we find no misconduct under the test laid down in *Bell.* The controversial evidence was not admitted until that question had been carefully weighed by the trial judge. The testimony presented and arguments on the issue consumed almost a full day of trial. This was only the second witness presented. Thus, it cannot be said that the evidence was presented out of fear that the State was about to lose the case, particularly when one considers that the extensive wiretap evidence connecting Mrs. Jones with the conspiracy had already been presented and the prosecution was well aware that yet another witness would be a co-conspirator whose testimony would entwine the accused with a number of narcotics violations stretching over a substantial period of time. It

cannot be said that the action here was done with the intent of forcing the defendant to move for or consent to a mistrial. Obviously, as in most evidence the State adduces, it was not intended to enhance her prospects for an acquittal, but it certainly was not intended to prejudice her prospects for an acquittal as that term is used in *Bell.* We find here no conduct by judge or prosecutor which would bar a retrial.

> *Judgment affirmed; appellant to pay the costs.*