749 A.2d 206

**Adel G. HAGEZ**

**v.**

**STATE of Maryland.**

**No. 902, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

April 3, 2000.

Samuel A. Abady, New York City, for appellant.

Diane E. Keller, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Marna McLendon, State's Attorney for Howard County, Ellicott City, on the brief), for appellee.

Argued before MOYLAN, DAVIS and HOLLANDER, JJ.

HOLLANDER, Judge.

Adel G. Hagez ("Hagez"), appellant, is not a newcomer to this Court; this is his fourth appeal stemming from charges that he murdered Riad Hijaz in 1991. As a result of Hagez's first appeal, we reversed his convictions and remanded the case to the Circuit Court for Howard County for a new trial.

*Hagez v. State,* 110 Md.App. 194, 676 A.2d 992 (1996) (*"Hagez I "*). The re-trial, which has not yet occurred, is at issue here.

Prior to the commencement of the re-trial, appellant unsuccessfully moved to dismiss the charges against him on the ground of double jeopardy. After two unsuccessful attempts to obtain relief from this Court, Hagez noted the present appeal. He presents a pentad of questions for our review, which we have condensed and reformulated as follows:

I. Did *Hagez I* decide the double jeopardy issue raised in appellant's motion to bar retrial?

II. Is retrial of appellant barred by the Fifth Amendment of the U.S. Constitution and Article 5 of the Maryland Declaration of Rights, due to prosecutorial misconduct?

For the reasons set forth below, we shall affirm.

## FACTUAL BACKGROUND

In order to analyze the issues raised by appellant, we shall begin by recounting the facts that culminated in appellant's convictions in 1993 for the offenses of first degree murder and use of a handgun in the commission of that offense.[1]

Virginia Hagez was divorced from appellant on March 8, 1991, after twenty-one years of marriage. A few months later, on June 22, 1991, Riad Hijaz was shot and killed in Room 410 of the Holiday Inn in Jessup, Maryland. That room was registered to Virginia Hagez. On Friday, April 30, 1993, while appellant was in jail awaiting trial for Hijaz's murder, set to begin on Monday, May 3, 1993, appellant and Ms. Hagez allegedly remarried.

At the time of the shooting, Ms. Hagez and others were affiliated with "The Mediterranean Chef," a portable food concession then servicing the Columbia City Fair in Howard County. Ms. Hagez's staff occupied Room 308 of the motel.

---

1. For a more detailed summary of the facts adduced at trial, see *Hagez I,* 110 Md.App. 194, 676 A.2d 992.

Ms. Hagez had specifically asked that no one be informed of her room number.

On the morning of June 22, 1991, Howard County police officers responded to the motel in answer to a call that shots had been fired. At about 9:50 a.m., Officers David Ash and Paul Yodzis entered Room 410 and saw the victim's body about a foot from the door. Two full cups of coffee were located on a table in the room, and a bag on the dresser contained five unopened cans of beer. A copper jacket was found on the unmade bed, and spent projectiles were found on the floor by the victim's body.

As Howard County Detective Luther Johnson drove onto the motel parking lot, a woman ran out of the entrance toward his vehicle. The woman, who later identified herself as Virginia Hagez, was "hysterical" and was "screaming." She told Johnson that someone had been shot in Room 410 and she asked, repeatedly, "Is he dead?"

Officer Victoria Plank also saw Ms. Hagez as she ran from the motel. She described Ms. Hagez as "rather hysterical at the time." Ms. Hagez told Officer Plank that she had asked a man with her group to assist her with her luggage. When the man arrived, she went to the motel clerk because of a discrepancy in the bill. Upon her return to the room, the man who was supposed to help with the luggage was on the floor, and she ran for help. According to Officer Plank, Ms. Hagez "continued to state that there was nothing going on between the two of them. That he had just been there to help with the suitcases."

On the morning of Saturday, June 22, 1991, Detective A.J. Bellido–Deluna was off duty and was working as a security officer at the Columbia Fair. He recalled that, at about 9:00 a.m., a red "Datsun Nissan type vehicle" with Virginia license plates parked behind him. He noticed a man with a briefcase exit the car and proceed to the Mediterranean Chef, where two men were setting up. After a brief conversation, the man left.

Bernadette Williams was the receptionist on duty at the Holiday Inn at the time of the killing. She testified that, shortly before 9:45 a.m., two men carrying "money bags" identified themselves as Virginia Hagez's employees from the carnival and asked for her room number. According to Williams, Ms. Hagez "kept calling downstairs and saying don't tell them what room I'm in." Consequently, Williams did not disclose the room number. A third man approached the men and talked to them. Then, all three walked away. Two of the men went outside, but the third one went toward the elevators. Williams did not know if appellant was one of the three men.

During the investigation, Sergeant Glenn Hansen interviewed Virginia Hagez several times. On June 25, 1991, using information obtained from Ms. Hagez, he directed Montgomery County police to the Shady Grove Metro Station parking lot. There, they found a red Nissan with Virginia license plates and parking tickets dated June 24 and 25, 1991. The car was registered to "The Roast Beef Co., Inc.," 2012 Fon–Du–Lac Road, Richmond, Virginia.

The police obtained a search warrant and seized the vehicle. Documents in the car established Mr. Hagez's residence at 2012 Fon–Du–Lac Road in Richmond. Police found a white bank pouch inside the passenger compartment of the Nissan, which appeared blood stained and contained eleven .38 caliber bullets. Two briefcases were in the trunk. One contained items belonging to Ms. Hagez, and the other had papers that appeared to be bloodstained. Between the papers was a bloodstained revolver with six spent cartridges, four from .38 caliber bullets and two from .357 caliber bullets. The gun was a Colt Lawman MK III 357 OTG revolver; appellant's fingerprint was found on the gun. The number of spent casings was consistent with the forensic examination, which revealed that Hijaz had been shot six times; three of the shots had been fired from within eighteen inches. The second briefcase also had bloodstained papers, including a letter addressed to appellant, the victim, and another man at 2012 Fon–Du–Lac Road, Richmond, Virginia. The same address also appeared on

other business papers, including a check drawn on the account of "The Roast Beef Company" that was signed by appellant.

FBI Special Agent J.R. Williamson, a firearms expert, testified that, due to insufficient microscopic markings, he could not determine if the bullets and bullet fragments recovered from the body of the victim and Room 410 were fired from the gun found in the red Nissan. Nevertheless, he concluded that certain of the bullets and bullet jackets could have been fired from the revolver in issue, based on the specific rifling impressions. He also said that certain of the .38 caliber bullets and the .357 caliber bullets belong to the same "family" of ammunition; Agent Williamson described them as "interchangeable." Moreover, both types of bullets may be fired from a .357 revolver.

Ms. Hagez was called as a witness by the State. Out of the presence of the jury, the court had previously rejected Ms. Hagez's invocation of her spousal privilege[2] and instructed her that she could be found in contempt if she refused to testify. Nevertheless, Ms. Hagez declined to answer any of the more than twenty questions posed by the prosecutor on direct examination.

Appellant did not present a defense case and the trial judge denied his motion for judgment of acquittal. After deliberating for nearly nine hours, the jury convicted appellant of murder in the first degree and a related handgun charge. Thereafter, appellant was sentenced to life imprisonment for the murder and a concurrent three-year term for the handgun offense.

On appeal in *Hagez I*, appellant presented a number of questions for our consideration, focusing on three general issues: (1) the sufficiency of the evidence; (2) the trial court's refusal to grant Ms. Hagez immunity from testifying; and (3) alleged prosecutorial misconduct.[3] Specifically, appellant al-

---

**2.** *See* Md.Code (1974, 1998 Repl.Vol.), § 9–106 of the Courts & Judicial Proceedings Article ("C.J.").

**3.** Appellant posed the following questions:

leged that the circuit court erred in allowing the State "1) to force Ms. Hagez to invoke the spousal privilege in front of the jury; 2) to persist in asking Ms. Hagez leading questions; and 3) to refer to Ms. Hagez's silence during closing argument." *Hagez I*, 110 Md.App. at 212–13, 676 A.2d 992. Although we concluded that the evidence was sufficient to support appellant's convictions, *id.* at 203–07, 676 A.2d 992, we agreed that reversal was warranted, based on appellant's claims of prosecutorial misconduct. Therefore, we found it unnecessary to "resolve the thorny issue concerning the availability of the [spousal] privilege, in light of our decision to reverse on other grounds." *Id.* at 211, 676 A.2d 992. With respect to our determination of prosecutorial misconduct, it is noteworthy that we never suggested that the State acted deliberately in an effort to abort the trial. To the contrary, we noted that the prosecutor acted zealously in an effort to secure a conviction.

In *Hagez I*, we recounted what transpired when Ms. Hagez was called to testify, stating:

I. Whether the trial judge erred by failing to grant Appellant's motions for judgment of acquittal, where the sole evidence in support of the charge of first degree murder was Appellant's fingerprint on a gun never proven to be the murder weapon.

II. Whether the trial judge erred by failing to grant Appellant's motions for judgment of acquittal, where the State failed to offer any evidence that the killing was wilful, deliberate or premeditated, assuming, *arguendo,* that the killing could be attributed to Appellant.

III. Whether the trial judge erred by refusing to recognize spousal immunity for Appellant's wife based on his finding that [C.J.] § 9–106 gave him discretion to decide whether or not to recognize the privilege.

IV. Whether the trial judge erred by permitting the State, over the Appellant's repeated objections, to call the Appellant's wife to the stand, and repeatedly threaten her with contempt in response to leading questions by which the State's Attorney testified against Appellant.

V. Whether Appellant's conviction must be vacated because the prosecutor engaged in prohibited misconduct by arguing facts in summation never put in evidence, and urging the jury to convict Appellant based on his wife's refusal to testify against him, in clear violation of the trial judge's instructions to the contrary.

*Hagez I,* 110 Md.App. at 198, 676 A.2d 992.

[I]n the presence of the jury, the court again ordered the witness to respond to the questions, reminded her that she was subject to contempt for her failure to respond, and told her that she could be sent to jail. Undaunted, Ms. Hagez again asserted her right not to testify. Still, the questions continued.

At yet another bench conference, defense counsel asked the court, "Your Honor how long will the Court permit [the prosecutor] to continue testifying?" The Court acknowledged the problem with the form of the State's questions when it said "Yeah you're getting your testimony in aren't you? . . . But you're asking leading questions to begin with. Answer yes or no . . . . She has indicated she is not going to answer any questions." The prosecutor's response is telling: "I understand that Your Honor. However, at this point for the purpose of the record I think the State should be permitted to ask certain questions. For her to assert the privilege that the Court has ruled she does not have." Understandably, the defense attorney vigorously objected, characterizing the State's position as "outrageous." He said, "This is not for purposes of the record. This is for purposes of the jury's information." In the face of this exchange, the court nonetheless decided to "allow [the State] to ask a couple more [questions] . . . ." As we see it, even if Ms. Hagez did not validly assert a privilege, the court "should have been conscious of the potential hazards of continued questioning."

The following questions exemplify those propounded by the prosecutor:

PROSECUTOR: Mrs. Hagez do you recall seeing an individual lying shot in your room at the Holiday Inn?

\* \* \* \* \* \*

PROSECUTOR: Mrs. Hagez I show you a photograph that has been accepted as State's Exhibit 5 of Room 410. I would ask you to take a look at that photograph Mrs.

Hagez. Do you recognize the individual in that photograph?

* * * * * *

PROSECUTOR: Mrs. Hagez do you recall making statements to members of the Howard County Police Department regarding what happened on June 22, 1991 at the Holiday Inn, Room 410?

* * * * * *

PROSECUTOR: Mrs. Hagez do you recall running outside the Holiday Inn screaming hysterical making certain statements to Officer Plank a female officer with the Howard County Police and Officer Luther Johnson a black officer with the Howard County Police?

* * * * * *

PROSECUTOR: Mrs. Hagez do you remember telling Officer Plank that you were not having an affair with the man?

* * * * * *

PROSECUTOR: Mrs. Hagez do you remember after the shooting coming back to Columbia, Maryland or specifically Ellicott City, Maryland and meeting with Detective Glenn Hansen to retrieve some documents from your briefcase?

Perhaps the most disturbing question is the one that follows:

PROSECUTOR: Mrs. Hagez do you recall on your statements to Howard County Police Officers identifying ... identifying to members of the Howard County Police Department who you saw outside your door with a gun?

The jury knew that Ms. Hagez claimed she was appellant's spouse. Therefore, the preceding question is akin to a prosecutor asking Marina Oswald if she had told the police

that she saw her husband in possession of a rifle at the Texas School Book Depository on November 22, 1963. The question itself is damning; the answer is almost irrelevant.

In this circumstantial case, in which not a single eyewitness identified appellant as the murderer and the physical evidence[,] although sufficient, was not compelling, the significance of Ms. Hagez's refusal to answer the State's questions cannot be overlooked. The jury knew that Ms. Hagez claimed she was appellant's wife. It was also aware that she was at the scene of the murder. Surely, the jury would have inferred that Ms. Hagez knew who committed the murder and that, if Ms. Hagez's testimony would have exonerated appellant, she would not have sought to invoke her marital privilege. . . .

We conclude that Ms. Hagez's repeated refusal to answer clearly provided "critical weight" to the State's case. The State sought to seize on the opportunity afforded to it by Ms. Hagez's silence; through its leading, testimonial questions, it attempted to place before the jury evidence that it was otherwise unable to present and to construct its case from inferences derived from its own questions.

\* \* \*

. . . The State's questions were tantamount to prosecutorial testimony. Moreover, the State's unrelenting effort to question Ms. Hagez, notwithstanding her refusal to testify, prejudiced appellant. We cannot blind ourselves to the actions of the prosecutor, who persistently sought to question Ms. Hagez, even though she may have improperly invoked her testimonial privilege.

*Id.* at 219–22, 676 A.2d 992 (citation omitted) (footnote omitted) (first nine omissions in original).

We also addressed appellant's claim of error based on the State's reference to Ms. Hagez's silence during closing argument. We stated:

In its closing argument, the State specifically commented on Ms. Hagez's silence, although the trial court had earlier

instructed the jury that Ms. Hagez's "refusal to answer questions is not evidence and you may not draw any inferences from it and any inferences from her refusal to answer questions." Indeed, out of an abundance of caution, the court reiterated to the jury that her refusal to testify was not evidence, no inferences could be drawn from the refusal and that the jury was not permitted to "speculate on what her testimony might have been." Yet the State disregarded the court's instructions and tried to capitalize on the situation it created. The prosecutor argued:

[PROSECUTOR]: You heard that Virginia Hagez ran out of the Holiday Inn hysterical, dry heaves, screaming, crying, she was upset, and isn't it interesting what information she gave to the police officers as she ran out of the Holiday Inn. A man was shot in her room. They weren't having an affair. I believe I will submit to you ladies and gentlemen that those words are very telling of what happened on June 22nd, 1991. A man was shot in my room. We weren't having an affair. What an odd thing for her to say. *Did she come forward on Friday of last week to relate to you that she said those statements to the members of the Howard County Police Department[?]*

DEFENSE COUNSEL: Objection.

THE COURT: I'll allow it. Go ahead.

[PROSECUTOR]: *[Ms. Hagez] was asked to take the stand. The [S]tate asked over twenty questions of her.* The first question was how long have you lived in Richmond. *Now my question is not evidence.* The question that I asked of her how long have you lived in Richmond should not suggest anything to you. It is just a question, but from the very beginning she refused to answer my questions. *There were many other questions not related to the events of June 22nd, 1991 and again the Court has instructed you that you were not to consider my questions as evidence, but when asked those questions Mrs. Hagez refused to answer.* There were three people in that room Riad Hijaz, Virginia Hagez and I submit to you

the defendant. Riad cannot speak to you and Virginia would not. *You may consider why Virginia Hagez would not speak to you.* She was a witness called upon by the [S]tate. The Court has given you a credibility of witness instruction and in that credibility of witness instruction he instructed you that you may consider motive to lie, bias[,] any of those things that all of us as ordinary citizens would consider in our daily lives when relating to individuals. *So while you may not consider the questions that I asked of Virginia Hagez I suggest to you you may consider her reason for not answering my questions.*

(Italics and boldface supplied).

\* \* \*

Three factors must be considered in order to determine whether a prosecutor's remarks are prejudicial to the accused. These are: (1) the closeness of the case; (2) the centrality of the issue affected by the error; and (3) the steps taken by the trial judge to mitigate the effects of the remarks on the jury. In applying these critical factors to the instant matter, we conclude that prejudicial error occurred. Our view is founded, at least in part, on the difficulty in parsing out the State's closing argument from the events that preceded it. The State's earlier questioning of Ms. Hagez, followed by its final argument, are fatally intertwined.

As we have observed, this was a close case. It is very likely that the jury would have concluded that Ms. Hagez was at the scene when the victim was killed and knew who perpetrated the murder. During her closing argument, the prosecutor insinuated that if Ms. Hagez had information that would have exonerated appellant, she surely would have answered the questions posed by the State. Therefore, "the improprieties of the prosecutor affected the most central issue in the case, appellant's guilt." With respect to the court's earlier efforts "to mitigate," its previous instruction to the jury was insufficient to cure the prejudice,

particularly because the prosecutor effectively disregarded the instruction and the court then overruled the defense's objection.

The prosecutor did not merely point out that Ms. Hagez had refused to testify. To the contrary, in telling the jury not to consider the prosecutor's questions, but only Ms. Hagez's refusal to answer those questions, the prosecutor was asking the jury to infer that the truthful answers to Ms. Hagez's questions would have incriminated appellant.

*Id.* at 223–27, 676 A.2d 992 (citations omitted) (footnote omitted) (first, third, fourth, and seventh alterations in original).

We concluded that the State's improper actions during the presentation of evidence and in its closing "were pervasive." *Id.* at 227, 676 A.2d 992. At the same time, we acknowledged that the prosecutor was zealously attempting to obtain a conviction, and we admonished the circuit court, stating that it should not "have allowed the State's zeal in securing a conviction to interfere with appellant's right to receive a fair trial." *Id.* Accordingly, our mandate read: **"JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR A NEW TRIAL. COSTS TO BE PAID BY HOWARD COUNTY."** *Id.*

On March 17, 1997, one day before the re-trial was scheduled to begin, appellant filed, *inter alia,* a motion to dismiss on the ground of double jeopardy (the "First Motion"). Following a hearing that spanned three days, the court held the matter *sub curia.* On June 10, 1997, the court filed a written memorandum opinion and order (the "First Order"), stating, in part:

The [First Motion], in essence, seeks to have this Court sit as a superior appellate court, in judgment of the Court of Special Appeals. This Court will not and cannot legally take that position.

... An appellate court's power of reversal has the same practical effect as a trial court's granting of a motion to dismiss: the defendant is free to go. To assert that an appellate court would remand the case to the trial court for

retrial, without consideration as to whether the retrial would be barred by double jeopardy, is myopic. Had the Court of Special Appeals believed that the prosecutor intended to provoke [appellant] into moving for a mistrial, it would have reversed the conviction. Period. Or, if the Court of Special Appeals had found the record devoid of information as to the prosecutor's intent, it would have reversed and remanded for a factual determination of whether the prosecutor had intended to provoke the Defendant into moving for a mistrial. The Court of Special Appeals did neither of these things. *It reversed and directed this Court to conduct a new trial.*

(Emphasis added).

Thereafter, Hagez noted an appeal to this Court. On December 19, 1997, we dismissed the appeal for failure to comply with certain procedural requirements (*"Hagez II "*).

After filing an unsuccessful motion to reconsider in the trial court, appellant filed a petition seeking post conviction relief. After the petition was denied, appellant filed an application for leave to appeal with this Court, and requested a belated direct appeal on the double jeopardy issue. We concluded that appellant did not qualify for post conviction relief, stating: "When the conviction was reversed and the judgment was vacated, the applicant was no longer qualified for the post conviction act." *Hagez v. State,* No. 212, Sept. Term 1998, slip op. at 2 (filed Dec. 10, 1998) (*"Hagez III "*); *see* Md.Code (1957, 1996 Repl.Vol., 1999 Supp.), Art. 27, § 645A(a)(1). We also said:

This does not mean that the applicant is without a remedy to seek the relief he desires. An order denying a motion to dismiss on double jeopardy grounds is interlocutory. An interlocutory order is subject to being changed by the circuit court any time prior to the entry of final judgment. Since the applicant has not been retried, no final judgment has yet been entered in this case. *Accordingly, he may yet again ask the circuit court to reconsider his motion to dismiss. If he does so, and the court denies the request, he*

*may file a direct appeal from that denial.* Moreover, should the appellant be convicted as a result of the retrial, he may raise the double jeopardy issue on direct appeal from that judgment.

*Hagez III,* slip op. at 2 (emphasis added) (citations omitted).

Thereafter, on March 24, 1999, appellant filed a motion to reconsider on the ground of double jeopardy in the circuit court (the "Second Motion"). The court denied that motion in a memorandum opinion and order filed on April 30, 1999. The court said, in pertinent part:

> [T]his Court held that retrial in this case was not barred by the principles of double jeopardy. This Court based its decision on two grounds. First, the prosecutorial misconduct identified by the Court of Special Appeals was designed to secure a conviction and not to abort the trial. Such prosecutorial misconduct does not bar retrial.... Second, this Court concluded it was bound by the decision of the Court of Special Appeals which "remanded to the Circuit Court for Howard County for a new trial.") [sic] That is, had the Court of Special Appeals believed that the prosecutor's conduct in the Hagez trial "was impermissibly motivated, [it] would have reversed and directed that the charges be dismissed rather than remanded for a new trial."
>
> Hagez now files this [Second Motion]. The Court has not been provided with anything indicating that its former decision in this matter was incorrect or in any way in proper [sic].

(Citations omitted).

Appellant has noted the present appeal ("*Hagez IV*") from the order denying the Second Motion. We will include additional facts in our discussion.

## DISCUSSION

### I.

In *Hagez IV,* appellant complains, *inter alia,* that the circuit court misinterpreted our decision in *Hagez I.* He argues that,

as a matter of law, we did not decide the double jeopardy issue in *Hagez I,* nor could we have done so. In appellant's view, we could not decide the issue because: (1) it was neither raised in nor decided by the circuit court at appellant's murder trial; (2) it was never briefed or mentioned in the first appeal; (3) it was not ripe for adjudication; (4) a ruling would have constituted an advisory opinion; and (5) this Court's determination in *Hagez I,* that the evidence was legally sufficient, had no bearing on the issue of double jeopardy.

According to the State, the trial court correctly denied appellant's motion to dismiss and the motions to reconsider "by looking to this Court's mandate [in *Hagez I* ] and finding regarding the prosecutor's intent." The State also suggests that Hagez's claim is "doomed as a matter of law," because he failed to move for a mistrial at his trial. The State does not suggest, however, that appellant waived his right to raise the double jeopardy claim, merely because he did not raise that issue in *Hagez I.*

 We begin our analysis with a review of what is commonly referred to as the "law of the case" doctrine. As we made clear in *Kline v. Kline,* 93 Md.App. 696, 700, 614 A.2d 984 (1992), "once a decision is established as the controlling legal rule of decision between the same parties in the same case it continues to be the law of the case." *See Loveday v. State,* 296 Md. 226, 230, 462 A.2d 58 (1983); *People's Counsel v. Prosser Co.,* 119 Md.App. 150, 176, 704 A.2d 483, *cert. denied,* 349 Md. 494, 709 A.2d 139 (1998). *But cf. Loveday,* 296 Md. at 234, 462 A.2d 58 (stating that the doctrine does not apply to the Court of Appeals when asked "to review judgments of subordinate courts"). Moreover, it is clear that arguments at odds with principles inherent in an appellate court's previous opinion are also precluded by the doctrine. In *Cohill v. Chesapeake & Ohio Canal Co.,* 177 Md. 412, 421–22, 10 A.2d 316 (1939), the Court of Appeals explained:

"Whatever, therefore, has been *definitely* decided by this [C]ourt in the prior appeals should be regarded as settled,

*and the principles upon which such decision rests* should be taken, as far as applicable, to control the questions now before us."

(Quoting *State v. Cowen,* 94 Md. 487, 494, 51 A. 171 (1902)) (Emphasis added).

Maryland Rule 8–604(a) is also relevant. It provides that an appellate court may dispose of an appeal by either dismissing the appeal pursuant to Md. Rule 8–602, affirming judgment, vacating or reversing judgment, modifying judgment, remanding the action to a lower court, or fashioning an "appropriate combination of the above." Maryland Rule 8–604(d), which governs an appellate court's remand, provides:

If the Court concludes that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment, or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court. In the order remanding a case, the appellate court shall state the purpose for the remand. *The order of remand and the opinion upon which the order is based are conclusive as to the points decided.* Upon remand, the lower court shall conduct any further proceedings necessary to determine the action *in accordance with the opinion and order of the appellate court.*

(Emphasis added).

As applied to the case *sub judice,* the law of the case doctrine and Md. Rule 8–604 instruct that *Hagez I* is "conclusive as to the points decided" in the previous appeal. Therefore, the trial court correctly recognized that its duty on remand was to "determine the action in accordance with the opinion and order of the appellate court." Md. Rule 8–604(d). On the other hand, the trial court obviously was not bound by points that we never decided. *See Davis v. Goodman,* 117 Md.App. 378, 406, 700 A.2d 798 (1997); *see also NCAA v. Johns Hopkins Univ.,* 301 Md. 574, 582, 483 A.2d 1272 (1984).

Accordingly, we turn to explore the holdings of *Hagez I.* As we noted, we held that the evidence was sufficient to support the convictions. In addition, we concluded that the State's

persistent questioning of Ms. Hagez, "even though she may have improperly invoked her testimonial privilege," justified reversal. We were also of the view that the State's reference in its closing argument to Ms. Hagez's refusal to testify, particularly when considered in light of the preceding events, compelled reversal. *Hagez I,* 110 Md.App. at 203–07, 221–22, 226–27, 676 A.2d 992. It is the scope of the second and third holdings with which we are principally concerned in this appeal.

In denying appellant's First Motion and his Second Motion, the trial court was guided by *Curry v. State,* 60 Md.App. 171, 481 A.2d 812 (1984) (*"Curry II "*), *cert. denied,* 302 Md. 130, 486 A.2d 173 (1985), an appeal following a remand ordered by this Court in *Curry v. State,* 54 Md.App. 250, 458 A.2d 474 (1983) (*"Curry I "*). In *Curry I,* we reversed the defendants' convictions for first degree murder, kidnapping, and a related handgun offense and remanded for a new trial, "because of the assistant state's attorney's reckless misrepresentation of the character of two State's witnesses, as well as the prosecutor's oblique manner of commenting upon the appellants' exercise of their right not to testify." *Curry I,* 54 Md.App. at 251–52, 458 A.2d 474 (footnote omitted). Prior to retrial, the defendants unsuccessfully moved for dismissal based on double jeopardy. A jury subsequently found them guilty of kidnapping. In their second appeal to this Court, the defendants argued, *inter alia,* that the lower court erred by denying their motion to dismiss. *Curry II,* 60 Md.App. at 174, 481 A.2d 812. Rejecting that contention, we observed, in *dicta,* that "[h]ad we believed the misconduct was impermissibly motivated, we would have reversed and directed that the charges be dismissed, rather than remanded for a new trial." *Id.* at 178, 481 A.2d 812. Interpreting *Curry II,* the court below understandably assumed that, because we reversed the judgments and remanded *Hagez's* case for a new trial, we had implicitly decided the double jeopardy issue as well.

In its First Order, the circuit court relied on the quoted language from *Curry II,* stating:

The case at bar stands in essentially the same posture [as the *Curry* case]. Here, the Defendant was tried and convicted for the first degree murder of Riad Hijaz. During the trial, the prosecutor made improper statements during examination of a witness and during closing argument. The Defendant appealed to the Court of Special Appeals on five grounds, one of which alleged that the [S]tate's reference, in closing argument, to a witness'[s] silence, constituted reversible error. The Court found that the evidence was sufficient to convict, but held that the prosecutor's questioning of a witness who had asserted privilege not to testify and her reference thereto in closing argument, constituted reversible error, and reversed and remanded for a new trial. The State now seeks to retry the Defendant, and the Defendant has made this pretrial motion to dismiss on the ground of double jeopardy, alleging that prosecutor's conduct was so reprehensible as to bar retrial.

This Court is bound by the holding of the Court of Special Appeals in *Hagez* [*I* ]. Had that Court believed that the prosecutor's misconduct in the Hagez trial "was impermissibly motivated, [it] would have reversed and directed that the charges be dismissed, rather than remanded for a new trial." *Curry* [*II* ], 60 Md.App. at 178 [481 A.2d 812]. This Court must follow the mandate of the Court of Special Appeals in *Hagez* [*I* ] and conduct a new trial.

(Footnote omitted).

■■■ Consequently, the court declined to address the merits of appellant's motion. We are not bound by the *dicta* in *Curry II,* however. Moreover, it is clear to us that a new trial was ordered in this case based on our consideration of the particular issues raised by appellant in *Hagez I.* As the earlier summary makes clear, we were never asked by appellant to consider whether principles of double jeopardy barred his retrial, and thus we did not decide that issue. *See* Md. Rule 8–131(a) (stating that, aside from certain jurisdictional questions, "[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court"). Because the

double jeopardy issue was neither raised in *Hagez I* nor decided by us, it follows that our mandate in *Hagez I* did not constitute a substantive determination of the double jeopardy issue.

## II.

Relying on the Fifth Amendment of the United States Constitution and Article 5 of the Maryland Declaration of Rights, appellant contends that prosecutorial misconduct "bars his retrial under double jeopardy, as a matter of law." As we noted earlier, the State asserts that double jeopardy principles do not restrict its ability to retry appellant, because he never moved for a mistrial at trial.

■ Preliminarily, we note that appellant has not articulated what role Article 5 should play in our analysis. It provides "[t]hat the Inhabitants of Maryland are entitled to the Common Law of England ... according to the course of that Law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six." Md. Const. art. 5. Because Maryland is one of only a few states that "has no constitutional bar against placing a defendant twice in jeopardy," the reference was presumably used to invoke common law prohibitions against double jeopardy. *West v. State*, 52 Md.App. 624, 626, 451 A.2d 1228 (1982); *see Bennett v. State*, 229 Md. 208, 212, 182 A.2d 815 (1962) ("The defense of former jeopardy is available in this State as a matter of common law unless and except as altered by statute."); *see also Gianiny v. State*, 320 Md. 337, 346–47, 577 A.2d 795 (1990) (discussing Maryland common law of double jeopardy). Nevertheless, because appellant has not presented a separate analysis of his double jeopardy claim under either Article 5 or common law, we confine our analysis to the application of the Fifth Amendment's Double Jeopardy Clause.

■ The Double Jeopardy Clause, made applicable to the states through the Fourteenth Amendment, provides that no person "shall ... be subject for the same offence to be twice

put in jeopardy of life or limb." *See Benton v. Maryland,* 395 U.S. 784, 796, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *Thanos v. State,* 330 Md. 576, 587, 625 A.2d 932 (1993); *State v. Jones,* 340 Md. 235, 242, 666 A.2d 128 (1995). As we recently explained, it "affords three basic protections to criminal defendants: '[It] protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.' " *Ashe v. State,* 125 Md.App. 537, 543–44, 726 A.2d 786 (quoting *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)), *cert. denied,* 354 Md. 571, 731 A.2d 969 (1999); *see United States v. Halper,* 490 U.S. 435, 440, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989); *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds by Alabama v. Smith,* 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989); *Fields v. State,* 96 Md.App. 722, 730, 626 A.2d 1037 (1993).

■ Notwithstanding these protections, a criminal defendant ordinarily may be retried after obtaining appellate reversal of a conviction. *See Ball v. United States,* 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); *Wooten–Bey v. State,* 308 Md. 534, 540, 520 A.2d 1090, *cert. denied,* 481 U.S. 1057, 107 S.Ct. 2199, 95 L.Ed.2d 853 (1987); *Huffington v. State,* 302 Md. 184, 189, 486 A.2d 200 (1985). In *Forman v. United States* 361 U.S. 416, 425, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960), *overruled on other grounds by Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), the Supreme Court said: "It is elementary in our law that a person can be tried a second time for an offense when his prior conviction for that same offense has been set aside by his appeal." This precept rests on the notion "that the original conviction has, at the defendant's behest, been wholly nullified and the slate wiped clean." *Pearce,* 395 U.S. at 721, 89 S.Ct. 2072; *accord Sweetwine v. State,* 288 Md. 199, 205, 421 A.2d 60, *cert. denied,* 449 U.S. 1017, 101 S.Ct. 579, 66 L.Ed.2d 477 (1980). Nevertheless, under certain circumstances, a criminal defendant may not be retried following a successful appeal. *See generally Whittle-*

*sey v. State,* 340 Md. 30, 80–81, 665 A.2d 223 (1995), *cert. denied,* 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996); *Jones v. State,* 288 Md. 618, 625, 420 A.2d 1241 (1980) (*"Jones III "*), *cert. denied,* 449 U.S. 1115, 101 S.Ct. 928, 66 L.Ed.2d 845 (1981).

One exception was articulated in *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). In that case, the defendant had been charged with murder in the first degree, but he was convicted of second degree murder. That conviction was subsequently reversed on appeal. Thereafter, the defendant was retried and convicted of first degree murder. The Supreme Court held that the prior conviction on a lesser charge was "an implicit acquittal on the charge of first degree murder," and declared that the defendant could not be retried for the greater offense. *Id.* at 190, 78 S.Ct. 221.

Another exception arises out of *Burks,* 437 U.S. at 1, 98 S.Ct. 2141. Based on the rationale of that case, the State is precluded from retrying a defendant who successfully obtains reversal of a conviction due to legal insufficiency of the evidence. *Id.* at 18, 98 S.Ct. 2141; *see also United States v. DiFrancesco,* 449 U.S. 117, 131, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980) (stating that "the Double Jeopardy Clause prohibits retrial after a conviction has been reversed because of insufficiency of the evidence").

Here, appellant does not rely on either of the exceptions enumerated above. Instead, appellant relies on the double jeopardy bar catalogued in the body of law leading to and derived from *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). Based on *Kennedy,* which addressed the effect of a mistrial granted at the defendant's request due to the prosecutor's misconduct, appellant argues that prosecutorial misconduct precludes a second trial under the Double Jeopardy Clause.

In *Kennedy,* the defendant, Bruce Kennedy, was charged with the theft of an oriental rug. During the trial in an Oregon court, a "crucial" witness for the State testified as to the value and identity of the rug. *State v. Kennedy,* 49

Or.App. 415, 619 P.2d 948, 949 (1980), *rev'd*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). In an attempt to establish bias on cross-examination, the defense elicited testimony from the witness that he had initiated criminal charges against the defendant. On redirect examination, the state embarked on a line of questioning aimed at establishing the witness's reasoning for filing the complaint. Defense objections to these inquiries were sustained. The colloquy that followed, however, led to an immediate grant of the defendant's motion for mistrial:

[PROSECUTOR]: Have you ever done business with the Kennedys?

[WITNESS]: No I have not.

[PROSECUTOR]: Is that because he is a crook?

*Id.*

Thereafter, Kennedy moved to dismiss the charges against him on the ground of double jeopardy. At a hearing on that motion, the prosecutor from the first trial called herself as a witness. Based on her testimony, the hearing court found that the prosecutor had not intended to cause a mistrial. *Id.* at 949 & n. 1. Consequently, the state was permitted to hold a second trial, at which Kennedy was convicted.

The Oregon Court of Appeals reversed. *Id.* at 950. Although it acknowledged that it was bound by the hearing court's finding as to the prosecutor's intent at the first trial, it concluded that the prosecutor's conduct constituted "overreaching," thus barring Kennedy's retrial on the ground of double jeopardy. *Id.* at 949–50. In arriving at its conclusion, the court stated:

The general rule is said to be that the double jeopardy clause does not bar reprosecution, " * * * where circumstances develop not attributable to prosecutorial or judicial overreaching, * * * even if defendant's motion is necessitated by prosecutorial error." *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1970). However, retrial is barred where the error that prompted the mistrial is intended to provoke a mistrial or is "motivated by bad

faith or undertaken to harass or prejudice" the defendant. *United States v. Dinitz,* 424 U.S. 600, 611, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). Accord, *State v. Rathbun,* 37 Or.App. 259, 586 P.2d 1136 (1978), *reversed on other grounds,* 287 Or. 421, 600 P.2d 392 (1979).

*Id.* at 949 (parallel citations omitted). The Oregon Court of Appeals considered the prosecutor's comment that the defendant was a "crook" to be "a direct personal attack on the general character of the defendant." *Id.* It then opined:

> [W]e think the prosecutor is charged with the knowledge that the comment—which we must treat as intentional, at least in the sense that it appears it was made deliberately and after some thought—was certain to interfere with the trial process. Defendant was then faced with a Hobson's choice—either to accept a necessarily prejudiced jury, or to move for a mistrial and face the process of being retried at a later time. There will be many circumstances in which the decision, in the face of this dilemma, to seek a mistrial will be deemed the equivalent of a waiver of a defendant's prior jeopardy rights. *See United States v. Jorn, supra,* 400 U.S. at 485 [91 S.Ct. 547]. However, this case of flagrant overreaching lies outside that general rule.

*Id.* at 950.

The Supreme Court rejected the Oregon appellate court's reasoning. It determined that because the Oregon hearing court "found, and the Oregon Court of Appeals accepted, that the prosecutorial conduct culminating in the termination of the first trial in this case was not so intended by the prosecutor, that is the end of the matter for purposes of the Double Jeopardy Clause." *Kennedy,* 456 U.S. at 679, 102 S.Ct. 2083.

In arriving at its conclusion, the Supreme Court noted the important distinction between the termination of a trial over the defendant's objection and "a mistrial declared at the behest of the defendant." It said: "Where the trial is terminated over the objection of the defendant, the classical test for lifting the double jeopardy bar to a second trial is the 'manifest necessity' standard...." *Id.* at 672, 102 S.Ct. 2083 (citing

*United States v. Perez,* 9 Wheat. 579, 22 U.S. 579, 580, 6 L.Ed. 165 (1824)). Where the defendant requests the mistrial, however, "the defendant himself has elected to terminate the proceedings against him, and the 'manifest necessity' standard has no place in the application of the Double Jeopardy Clause." *Id.* (citing *Dinitz,* 424 U.S. at 607–10, 96 S.Ct. 1075). The Court then explained:

> Our cases ... have indicated that even *where the defendant moves for a mistrial, there is a narrow exception to the rule that the Double Jeopardy Clause is no bar to retrial.* The circumstances under which respondent's first trial was terminated require us to delineate the bounds of that exception more fully than we have in previous cases.

*Id.* at 673, 102 S.Ct. 2083 (emphasis added) (citing *DiFrancesco,* 449 U.S. at 130, 101 S.Ct. 426; *Dinitz,* 424 U.S. at 611, 96 S.Ct. 1075; *Jorn,* 400 U.S. at 485, 91 S.Ct. 547; *United States v. Tateo,* 377 U.S. 463, 468 n. 3, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964)).

The Supreme Court expounded upon the "narrow exception," stating:

> "[The Double Jeopardy Clause] bars retrials where 'bad-faith conduct by judge or prosecutor,' threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant." *United States v. Dinitz,* 424 U.S., at 611 [96 S.Ct. 1075] (citation omitted).
>
> The language just quoted would seem to broaden the test from one of *intent* to provoke a motion for a mistrial to a more generalized standard of "bad faith conduct" or "harassment" on the part of the judge or prosecutor. It was upon this language that the Oregon Court of Appeals apparently relied in concluding that the prosecutor's colloquy with the expert witness in this case amount to "overreaching."

*Id.* at 674, 102 S.Ct. 2083.

Wary of widening the test, the Supreme Court settled on "a standard that examines the intent of the prosecutor," reason-

ing that such a standard "merely calls for the [trial] court to make a finding of fact." *Id.* at 675, 102 S.Ct. 2083. Further, it said:

> Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal justice system. When it is remembered that resolution of double jeopardy questions by state trial courts are reviewable not only within the state court system, but in the federal court system on habeas corpus as well, the desirability of an easily applied principle is apparent.
>
> *Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. . . . Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.*

*Id.* at 675–76, 102 S.Ct. 2083 (emphasis added).

In the following paragraph, the Supreme Court explicated its holding:

> We do not by this opinion lay down a flat rule that where a defendant in a criminal trial successfully moves for a mistrial, he may not thereafter invoke the bar of double jeopardy against a second trial. *But we do hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.*

*Id.* at 679, 102 S.Ct. 2083 (emphasis added).[4]

Here, appellant would have us create a limited extension of *Kennedy.* He asserts:

---

4. Citing to the hearing with respect to the First Motion and appellant's brief, the State observes: "It must be emphasized that Hagez has

[I]t is clear that a double jeopardy bar arising from prosecutorial misconduct is equally available whether following a successful appeal from conviction or following a mistrial. *Jones v. State,* 44 Md.App. 417, 420 [409 A.2d 725] (1979) [ (*"Jones II "*) ], *aff'd,* 288 Md. 618 [420 A.2d 1241] (1980), *cert. denied,* 449 U.S. 1115 [101 S.Ct. 928, 66 L.Ed.2d 845] (1981); *United States v. Curtis,* 683 F.2d 769, 774 (3d Cir.) [ (*"Curtis II "*) ], *cert. denied,* 459 U.S. 1018 [103 S.Ct. 379, 74 L.Ed.2d 512] (1982); *United States v. Rios,* 637 F.2d 728, 729 (10th Cir.1980), *cert. denied,* 452 U.S. 918 [101 S.Ct. 3054, 69 L.Ed.2d 422] (1981); *United States [ex rel. Beringer ] v. O'Grady,* 737 F.Supp. 478, 484–85 (N.D.Ill.1990), *aff'd [sub nom. Beringer v. Sheahan ],* 934 F.2d 110 (7th Cir.), *cert. denied,* 502 U.S. 1006 [112 S.Ct. 641, 116 L.Ed.2d 658] (1991); *Buffington v. Copeland,* 687 F.Supp. 1089, 1093–94 (W.D.Tex.1988); *People v. Cavallerio,* [104 Misc.2d 436] 428 N.Y.S.2d 585 ( [Sup.Ct.] 1980).

The State counters that appellant has incorrectly asked us "to expand the rule announced in *Oregon v. Kennedy,* and to carve out an additional exception barring retrial where, as here, there was no mistrial or even a motion for mistrial based on prosecutorial misconduct, but rather a successful appeal based on that ground." In his reply brief,[5] appellant attacks the State's approach to *Kennedy* as "mechanistic," and suggests that we look "to the nature and extent of the prosecutor's misconduct."

We disagree with Mr. Hagez's position and find little guidance in his string of citations. Preliminary, we observe that appellant has mischaracterized *Kennedy.* Moreover, appellant has virtually ignored the threshold question of whether a mistrial motion must be made and granted in order to invoke the *Kennedy* bar.

---

expressly disavowed any need for a hearing in this case to determine the prosecutor's intent."

**5.** Maryland Rule 8–503(d) limits a reply brief filed in this Court to 15 pages. Appellant's reply brief is more than 30 pages.

In his brief, appellant claims that *"Kennedy* involved precisely the situation that arises here." According to appellant, Kennedy "was convicted before an Oregon circuit court, then the Oregon Court of Appeals reversed and remanded for a new trial, and Kennedy thereafter moved in the circuit court to dismiss the charges based on double jeopardy. 456 U.S. at 669, 102 S.Ct. 2083." As we have just shown, however, the first trial in *Kennedy* ended in a mistrial. On retrial, a second judge declined to grant the defendant's motion to dismiss the charges based on double jeopardy. Thereafter, the defendant was tried and convicted. *Kennedy,* 619 P.2d at 949. Kennedy subsequently appealed to the Oregon Court of Appeals, alleging that the "retrial" court erred in refusing to dismiss the charges against him. *Id.* Thus, appellant's reliance on *Kennedy* is misplaced; unlike the defendant in *Kennedy,* appellant never asked for a mistrial, and obviously no mistrial was granted.

The parties' arguments closely resemble those offered by the litigants in *United States v. Wallach,* 979 F.2d 912 (2d Cir.1992) (*"Wallach II "*), *cert. denied,* 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993).[6] In its predecessor, *United States v. Wallach,* 935 F.2d 445 (2d Cir.1991) (*"Wallach I "*), the Second Circuit reversed the convictions of three co-defendants, including Eugene Wallach, because of prosecutorial misconduct. *See Wallach I,* 935 F.2d at 457. Facing retrial on a number of charges, Wallach filed an unavailing motion to dismiss on double jeopardy grounds. Thereafter, he noted an interlocutory appeal. *See Wallach II,* 979 F.2d at 913–14. The Second Circuit framed the contentions of the parties in *Wallach II* as follows:

> The Government reads *Kennedy* as limited to its context of a criminal trial that ends with the granting of a defendant's motion for a mistrial. In the Government's view, *Kennedy* affords Wallach no benefit because he did not even move for a mistrial, much less obtain one; indeed, the trial

---

**6.** *Wallach II* is not cited by either party in their respective initial briefs. Appellant does, however, quote a short excerpt from *Wallach II* in his reply brief.

ended, not with a mistrial, but with a conviction. On the other hand, Wallach reads *Kennedy* without the limitation of the mistrial context and extracts from it a rule of more general application: "The Supreme Court's rationale is that the Double Jeopardy Clause bars a second prosecution when the prosecutor engages in serious misconduct with the intention of preventing an acquittal."

*Id.* at 915 (quoting Wallach's brief).

The Second Circuit declined to extend *Kennedy* to the reaches suggested by Wallach, but did offer up a "limited extension":

If any extension of *Kennedy* beyond the mistrial context is warranted, it would be a bar to retrial only where the misconduct of the prosecutor is undertaken, not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct. If jeopardy bars a retrial where a prosecutor commits an act of misconduct with the intention of provoking a mistrial motion by the defendant, there is a plausible argument that the same result should obtain where he does so with the intent to avoid an acquittal he then believes is likely. The prosecutor who acts with the intention of goading the defendant into making a mistrial motion presumably does so because he believes that completion of the trial will likely result in an acquittal. That aspect of the *Kennedy* rationale suggests precluding retrial where a prosecutor apprehends an acquittal and, instead of provoking a mistrial, avoids the acquittal by an act of deliberate misconduct. Indeed, if *Kennedy* is not extended to this limited degree, a prosecutor apprehending an acquittal encounters the jeopardy bar to retrial when he engages in misconduct of sufficient visibility to precipitate a mistrial motion, but not when he fends off the anticipated acquittal by misconduct of which the defendant is unaware until after the verdict. There is no justification for that distinction.

*Id.* at 916. Nonetheless, the court ultimately concluded that application of the extension to Wallach's case "avail[ed] him of nothing." *Id.*

Several states have adopted the "limited extension" espoused in *Wallach II. See, e.g., State v. Colton*, 234 Conn. 683, 663 A.2d 339, 346–48 (1995), *cert. denied*, 516 U.S. 1140, 116 S.Ct. 972, 133 L.Ed.2d 892 (1996); *State v. Lettice*, 221 Wis.2d 69, 585 N.W.2d 171, 180–81 (Wis.Ct.App.1998); *id.* at 180 n. 3 (citing cases). In *Colton*, for example, the Connecticut Supreme Court embraced *Wallach II*, but noted that expansion of "the *Kennedy* doctrine in this limited circumstance is particularly compelling . . . [when] some of the evidence that the defendant intended to use to demonstrate prosecutorial misconduct was not part of the record on appeal from the previous trial." *Colton*, 663 A.2d at 346. The Wisconsin Court of Appeals applied *Wallach II*'s limited extension to determine "whether the double jeopardy clause affords protection against retrial to a defendant who has not moved for a mistrial because he or she is not fully aware at trial of the motivation for or effect of the prosecutor's misconduct." *Lettice*, 585 N.W.2d at 178.

Three of the cases cited by appellant—*Jones II, Rios*, and *Cavallerio*—were decided before *Kennedy*. The inherent weakness in those decisions is, of course, that none of them examined *Kennedy*. Nonetheless, we will address each in turn.

The first of the cases cited by appellant, and the only one to arise out of this jurisdiction, is *Jones II*, 44 Md.App. at 417, 409 A.2d 725.[7] There, we were asked to bar a retrial because, in a prior unreported opinion (*"Jones I "*), we reversed the defendant's criminal drug conviction and remanded the case for a new trial on the ground that the State violated a pretrial agreement it had with the defendant not to introduce certain evidence. *See Jones II*, 44 Md.App. at 428–29, 409 A.2d 725. We concluded that the State's action constituted a denial of due process. *Id.* at 429, 409 A.2d 725. In reviewing the defendant's second appeal, we observed:

---

**7.** This Court's entire unreported opinion in *Jones I* was reproduced as an appendix to *Jones II. See Jones II*, 44 Md.App. at 424, 409 A.2d 725.

[T]here is but a technical difference when a trial judge recognizes prosecutorial misconduct intended to prejudice [an] accused's prospects for acquittal by granting a mistrial *e.g., Bell* [*v. State*, 286 Md. 193, 406 A.2d 909 (1979) ], and when such judge should have either excluded the evidence or granted a mistrial, and is reversed for having permitted the prejudicial evidence improperly elicited to prejudice appellant's prospect for acquittal.

We have difficulty distinguishing why one retrial should be barred and another permitted when an accused "faced with the 'Hobson's choice' of continuing with the trial or requesting or consenting to a mistrial", *Bell, supra*, at 203[ 406 A.2d 909], decides to continue rather than move to abort. Indeed the distinction is even less when the decision is left to the judge. The cause, as well as the effect, is the same in either case.

*Id.* at 420, 409 A.2d 725. Further, we found "no justification for barring a retrial of a case concluded, but *reversed* because of prosecutorial misconduct," and ultimately concluded that we are "compelled to follow 'clear' holdings of the Supreme Court, as we are of the Court of Appeals, and both Courts indicate that evidentiary insufficiency is the *only* cause of reversal that will bar retrial after conviction." *Id.* at 422, 423, 409 A.2d 725.

The Court of Appeals subsequently affirmed that decision, but on a different rationale. *Jones III,* 288 Md. at 619, 420 A.2d 1241. For purposes of its discussion, the Court adopted the defendant's proposed exception to the general rule that appellate reversal of a conviction does not bar retrial; it assumed, *arguendo,* "that the breach of the [pre-trial] agreement ... would have justified the grant of a motion for a mistrial and that, since this would have been on the basis of prosecutorial overreaching, the retrial is barred by the Double Jeopardy Clause." *Id.* at 626, 420 A.2d 1241. Nevertheless, the Court decisively stated that the alleged prosecutorial misconduct in the defendant's case did not rise to the level necessary to bar a second trial in the event a mistrial had been granted. *Id.* at 634–35, 420 A.2d 1241.

In *Rios*, 637 F.2d at 728, the defense moved for mistrial when the prosecutor made improper remarks in closing argument. The motion was denied and the defendant was convicted. After the Tenth Circuit reversed the conviction because of prosecutorial misconduct, the defendant unsuccessfully moved to bar retrial on double jeopardy grounds, prompting a second appeal to the Tenth Circuit. That court concluded "that double jeopardy considerations applicable after a mistrial has been granted are indeed applicable in the same manner when prosecutorial misconduct requires reversal of a conviction for lack of a fair trial *after a mistrial motion has been denied.*" *Rios*, 637 F.2d at 729 (emphasis added).

The third pre-*Kennedy* case, *Cavallerio*, 428 N.Y.S.2d at 585, involved two criminal defendants, each convicted of first degree rape. The New York intermediate appellate court reversed and remanded, due to "calculated and deliberate prosecutorial misconduct." *Id.* at 586. Upon remand, the trial court held that a retrial was barred on double jeopardy grounds. It reasoned that if the trial court had granted the defendants' motion for mistrial at the first trial, a retrial would have been barred by the Double Jeopardy Clause. *Id.* at 587. Therefore, it said:

> So long as the retrial is caused by deliberate prosecutorial misconduct, of such a nature and so calculated as to be likely to cause a new trial on successive appeals, what difference is there to the defendant if his successive trials are caused by conduct calculated to bring about a mistrial or conduct which the prosecutor knows will result in reversal, should there be a conviction. . . .

> Therefore, this Court holds that the same reasoning applicable to mistrials caused by deliberate and calculated actions by a prosecutor is applicable to a reversal on appeal caused by deliberate and calculated actions of the prosecutor.

*Id.*

The remaining cases cited by appellant, *Curtis II*, *Buffington*, and *O'Grady*, were decided after *Kennedy*. We turn to explore them.

*Curtis II,* 683 F.2d at 769, was decided less than two months after *Kennedy.* There, the defendant was convicted by a jury of drug and firearms offenses. Although the Third Circuit denied the defendant's motion for mistrial, his conviction was reversed and the case was remanded because of prosecutorial misconduct that was considered "cumulative in effect." *United States v. Curtis,* 644 F.2d 263, 269–71 (3d Cir.1981) (*"Curtis I "*). At a hearing before the second trial, the district court granted the defendant's motion to dismiss the indictment on double jeopardy grounds. The government appealed, arguing "that imposition of a double jeopardy bar is appropriate only in situations where a conviction is reversed for insufficiency of evidence or where prosecutorial misconduct is intended to cause a mistrial and in fact does so." *Curtis II,* 683 F.2d at 772. The defendant responded "that a double jeopardy defense to retrial is also permissible when such prosecutorial misconduct leads to an appellate reversal, even though it does not result in an immediate mistrial." *Id.* In *dicta,* the Third Circuit stated: [8]

> Given sufficiently prejudicial prosecutorial misconduct, a mistrial will result if the trial judge correctly recognizes the nature of the violation; appellate reversal is necessary only if the trial judge errs. It would appear inconsistent to afford a defendant less constitutional protection *simply because a trial judge erred in denying a mistrial request.* If an appellate reversal does not preclude retrial in a situation where the granting of a mistrial for the same misconduct would have done so, the rights of the defendant appear to turn on which of two courts—the trial or appellate court—first recognizes the impropriety of the prosecutor's actions.

*Id.* at 774 (emphasis added).

The second post-*Kennedy* case, *Buffington,* 687 F.Supp. at 1089, involved a federal habeas petition. *See* 28 U.S.C. § 2254

---

**8.** Interestingly, the court noted at the outset of its discussion on these points that it "view[ed] this question as both complicated and close; but ... conclude[d] that its ultimate resolution [was] not necessary" to the appeal. *Curtis II,* 683 F.2d at 772.

(1994 & Supp. III 1997). In *Buffington,* a murder conviction had been reversed by a Texas criminal appellate court because of the trial court's error in excluding two jurors. Thereafter, the defendant filed a petition in federal district court for a writ of habeas corpus. The issue in that case was "whether prosecutorial misconduct, although not resulting in mistrial and not discovered until after the defendant was convicted, bars retrial of Petitioner under the Double Jeopardy Clause." *Buffington,* 687 F.Supp. at 1089–90.

Given the factual circumstances in *Buffington,* the court advanced three possible interpretations of *Kennedy.* The first, offered by Texas, was that "*Kennedy* establishes a per se rule that only bars retrial in the narrow circumstances where a mistrial has actually occurred and the prosecutor has goaded the defendant into making the motion." *Id.* at 1090. Another interpretation, offered by the defendant, was that "the Double Jeopardy Clause would bar retrial if (1) the prosecutor's conduct was sufficiently egregious; and (2) a sufficient likelihood existed that the first trial would have proceeded to acquittal absent the prosecutorial misconduct." *Id.* at 1091. The interpretation adopted by the court required "the reviewing court ... [to] ask whether the prosecutor's conduct was motivated by an intent to goad a mistrial or deny the defendant ... his double jeopardy protections." *Id.*

The defendant's habeas petition was denied. *Id.* at 1105. The federal court indicated that it had "reservations about applying the *Kennedy* test to a factual situation where no mistrial motion was made, or quite possibly could have been made." *Id.* at 1092. In fact, subsequent to its *Kennedy* discussion, the court stated that "[t]he foregoing analysis should make clear the difficulty of applying *Kennedy's* holding to the facts in this case.... *Brady* [*v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),] rather than *Kennedy* may well be the more appropriate analytical vehicle for this case." *Id.* at 1095.

*O'Grady,* 737 F.Supp. at 478, also involved a writ of habeas corpus. There, Joseph Beringer, the petitioner, was convicted

of murder by an Illinois trial court. An intermediate state appellate court reversed due to prosecutorial misconduct. Thereafter, arguing that the misconduct was intentional, Beringer sought to bar Illinois from retrying him, claiming "the state prosecutor committed gross misconduct during his cross-examination of [the only eye-witness] with the intent to provoke a mistrial." *Id.* at 483. Although Beringer had moved for a mistrial, he had not done so on the grounds that formed the basis for his habeas claim. *Id.* at 486. The court said:

Arguably, if the prosecution had in fact intended to cause a mistrial, such an intention would have been most apparent to petitioner and his counsel during the trial, when the alleged misconduct was taking place. Despite ample opportunity, however, petitioner never moved for mistrial based on the prosecutor's cross-examination of [the eye-witness], a cross-examination which petitioner now claims was riddled with instances of intentional misconduct.

Petitioner's failure to move for a mistrial based on the cross-examination of [the eye-witness] is particularly telling because he moved for a mistrial based on *other* grounds shortly after the cross-examination of Webb. Thus, petitioner cannot claim that his failure to request a mistrial based on the State's cross-examination of [the eye-witness] was merely an oversight. Nor can petitioner argue that during trial he did not have sufficient evidence of the prosecutor's intent. All of the facts and inferences on which petitioner now relies to show intentional prosecutorial misconduct were available to petitioner prior to or at the time of the State's cross-examination of [the eye-witness].

The court also finds it significant that the trial judge did not declare a mistrial. Even absent a motion from petitioner, the trial judge certainly would have declared a mistrial if he determined the prosecutor was intentionally conducting improper cross-examination in order to get a mistrial....

Respondents maintain that the ruling in *Kennedy* should not be extended to situations where, as here, the case is reversed for prosecutorial misconduct; they argue that a double jeopardy claim under *Kennedy* should be available

only where the trial court declares a mistrial. The court rejects respondents' position. Adopting respondents' interpretation of *Kennedy* would make a defendant's constitutional right to claim double jeopardy dependent on whether the trial court correctly recognizes that a mistrial is in order—a fact wholly outside the power of the defendant.... Therefore, the court finds that the trial judge's failure to declare a mistrial does not preclude petitioner's double jeopardy claim based on intentional prosecutorial misconduct.

*Id.* at 486–87 (citations omitted) (footnotes omitted).

Notwithstanding this discussion, the *O'Grady* court denied the writ, looking to the trial judge's failure to order a mistrial and to the strength of Illinois's case. *Id.* at 487–88. It stated that there was "no rational explanation for the prosecutor's cross-examination of the [witness]," and agreed with the findings of an Illinois trial judge "that the prosecutor's conduct was the result of emotional, heated animus between the prosecutor and [the witness] and the prosecution and the defense." *Id.* at 487.

We do not consider any of the cases discussed above persuasive with respect to appellant's position. As to *Jones II*, a pre-*Kennedy* case, appellant has seemingly disregarded our statement that we could "find no justification for barring a retrial of a case concluded, but *reversed* because of prosecutorial misconduct." *Jones II*, 44 Md.App. at 422, 409 A.2d 725. Moreover, Hagez has failed to discuss what effect, if any, the opinion of the Court of Appeals in *Jones III* had on this Court's decision in *Jones II*. Further, *Rios* and *Cavallerio*, the other pre-*Kennedy* cases, both involved situations in which a defendant had unsuccessfully moved for mistrial. The three post-*Kennedy* cases are equally unpersuasive. The court implied in *Curtis II* that a mistrial motion is ordinarily required. The misconduct in *Buffington* was not discovered until after conviction, so it obviously was impossible for the defendant to move for mistrial during the trial. Finally, Hagez's reliance on *O'Grady* is misplaced, particularly in light of the Seventh Circuit's decision in *Beringer*, 934 F.2d at 110, the direct

appeal from the denial of the writ in *O'Grady.* Indeed, appellant has not discussed *Beringer* in his briefs submitted to this Court.

In that case, the Seventh Circuit expanded upon the *O'Grady* court's discussion of Beringer's failure to move for mistrial based the misconduct that led to his habeas petition. As the court framed the issue, the question was whether *Kennedy* applies when the defendant has not moved for a mistrial on the ground of prosecutorial misconduct. *Beringer,* 934 F.2d at 111. Its response has particular relevance to this appeal:

> The Fourth Circuit has said that it does not. *United States v. Head,* 697 F.2d 1200, 1206 (4th Cir.1982), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3113, 77 L.Ed.2d 1367 (1983). A number of other courts have addressed essentially the same question without answering it definitively, concluding that it was unnecessary to resolve the issue since applying the demanding standard of *Kennedy* did not change the outcome of those cases. Without offering an opinion as to whether applying the rule would affect the outcome of this case, we choose to take a more direct tack and confront the question of the rule's applicability.... Resolving this issue will let defendants confronted at trial with serious prosecutorial misconduct know the proper course of action to preserve their double jeopardy rights; reserving it may lull them into sitting on their rights.

*Id.* at 111–12 (footnote omitted).

The court in *Beringer* concluded that "a mistrial motion is required," reasoning as follows:

> In *Kennedy,* the Court relied on *DiFrancesco* [, 449 U.S. at 130–31, 101 S.Ct. 426] when it observed that the double jeopardy clause would not bar the reprosecution of even those defendants who move *unsuccessfully* for mistrials on the basis of prosecutorial misconduct but succeed in having their convictions reversed on that ground on appeal. *See* 456 U.S. at 676–77 & nn. 6–7 [102 S.Ct. 2083]. Though dicta, the Court's reference to *DiFrancesco* suggests that it did not intend the *Kennedy* exception to conflict with the well-

established strand of double jeopardy law permitting retrial after appellate reversal, and squares with the Court's explicit view of the "narrow" scope of the *Kennedy* exception. On at least one occasion since *Oregon v. Kennedy* was published, the Court has characterized the rule as one that applies "to mistrials granted ... on motion of the defendant." *Richardson v. United States*, 468 U.S. 317, 324, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984).

*Id.* at 112. · Accordingly, the *Beringer* court held "that a defendant who did not move for a mistrial on the basis of prosecutorial misconduct cannot invoke the double jeopardy clause to bar the state from retrying him after his conviction is reversed on that ground." *Id.* at 114.

The court discussed the rationale for predicating the applicability of the double jeopardy bar on a prior mistrial motion. *Beringer*, 934 F.2d at 112–14; *see Kennedy*, 456 U.S. at 686–87 & n. 22, 102 S.Ct. 2083 (Stevens, J., concurring). The following comment is instructive:

> To be sure, prosecutorial misconduct, like any other error that unfairly prejudices a defendant, diminishes the value of [the right to obtain a verdict from the first jury]. But *it is the right to appeal, not the double jeopardy clause, that protects defendants from trial errors.* The double jeopardy clause serves not to punish prosecutorial misconduct; it simply ensures that the defendant, not the government, gets to choose whether to go to verdict. For that reason, when a defendant moves for a mistrial, whether for prosecutorial misconduct or any other trial error, the double jeopardy clause does not ordinarily bar retrial; the defendant's motion ordinarily serves to waive the right not to be retried. *Only when the government intentionally and successfully forces the defendant to move for a mistrial does it deprive the defendant of the right to go forward.*

*Beringer*, 934 F.2d at 113 (emphasis added) (citations omitted).

*Beringer*'s persuasiveness is strengthened by the Fourth Circuit's decision in *Head*, 697 F.2d at 1200, referred to in *Beringer*. In *Head*, the defendant was convicted of various

offenses. At trial, the defendant failed to make a motion, on any ground, for mistrial. On appeal, one of the criminal convictions was reversed and the case was remanded for a new trial. Prior to the second trial, the defendant argued, *inter alia,* that prosecutorial misconduct in the first trial barred his retrial on double jeopardy principles. *Head,* 697 F.2d at 1203. Addressing this contention, the Fourth Circuit stated:

[T]rial before the first tribunal had been completed *with no request for mistrial having been made.* The suggestion of prosecutorial misconduct was only raised after defendant's appeal had secured a retrial because of trial court error that was found independently of any prosecutorial misconduct in its inducement.

*Id.* at 1206 (emphasis added). In a footnote, the court recognized that several decisions from other federal circuits "contain[ ] suggestions that where a defendant secures reversal of his conviction because of prosecutorial misconduct following denial of his trial court motion for mistrial on that ground, double jeopardy protections might bar his retrial." *Id.* at 1206 n. 10. The court declined to address that issue, however, because it was not before the court. *Id.* Consequently, the Fourth Circuit concluded that "no double jeopardy right of the defendant [was] implicated." *Id.* at 1206.

Our own review of *Head* leads us to the same interpretation as that offered by the court in *Beringer,* 934 F.2d at 111. It appears to us that the Fourth Circuit said in *Head* that the rationale of *Kennedy* does not apply unless the defendant first moves for mistrial on grounds of prosecutorial misconduct. But, the *Head* court did not address whether it is also necessary for a trial court to grant a mistrial motion in order for a defendant to successfully invoke the double jeopardy bar.

We acknowledge that the Second Circuit's opinion in *Wallach II* conflicts with the Seventh Circuit's decision in *Beringer* and the Fourth Circuit's opinion in *Head. Cf. Colton,* 663 A.2d at 346 & n. 13 (acknowledging a split among the federal circuits and contrasting *Wallach II* with *Beringer* );

*Lettice,* 585 N.W.2d at 178, 180–81 (distinguishing *Beringer* "factually and procedurally" and adopting the limited extension of .*Wallach II* ). Nevertheless, we agree with the positions of the *Beringer* and *Head* courts. Accordingly, we conclude that when alleged prosecutorial misconduct is readily apparent at a criminal trial, a defendant must make a timely mistrial motion as a predicate to invoking the *Kennedy* bar to retrial based on double jeopardy. In this case, despite appellant's objections at trial to the prosecutor's conduct, he never sought a mistrial. Accordingly, although we agreed in *Hagez I* that the prosecutor's conduct was prejudicial and required a reversal, 110 Md.App. at 227, 676 A.2d 992, appellant's earlier failure at trial to request a mistrial bars his later double jeopardy claim. Therefore, based on the circumstances attendant here, we need not address whether a trial court must actually grant a defendant's mistrial motion in order for a defendant to successfully rely on double jeopardy to bar a retrial.

Moreover, even if a timely motion for mistrial were *not* a prerequisite for a successful double jeopardy claim based on *Kennedy,* appellant would not prevail. Writing for this Court in *West v. State,* 52 Md.App. 624, 451 A.2d 1228 (1982), Judge Moylan carefully traced the evolution of the Supreme Court jurisprudence that led to the then recent decision in *Kennedy,*[9] and explained that, based on concurrent developments in Maryland law, a mistrial flowing from a prosecutor's zeal in obtaining a conviction does not necessarily preclude a re-trial.

In *West,* the appellant alleged, *inter alia,* that retrial placed him twice in jeopardy, because his earlier mistrial request was granted on the ground of prosecutorial misconduct. *West,* 52 Md.App. at 625, 451 A.2d 1228. In addressing this contention, Judge Moylan assessed the implications of *Kennedy* and wrote:

> [W]e must look not to the error itself and not to the plight of the defendant who has been afflicted by that error but

---

**9.** The *Kennedy* opinion was "but two weeks old" when this Court heard oral argument in *West. West,* 52 Md.App. at 626, 451 A.2d 1228.

rather to the intent with which the error was committed. Leaving to the side, for reasons of linguistic economy, the parallel problem of judicial misconduct, we are called upon to assess the motive of the prosecutor. When we speak of intentional misconduct, we are not speaking of a mere general intent to do the act. Absent the rare case of the Freudian slip or the muscular spasm, the prosecutor always intends (1) to ask the question, that turns out to have been erroneous; (2) to make the argument, that turns out to have been inflammatory; and (3) to introduce the evidence, that turns out to have been inadmissible. The double jeopardy law contemplates some specific intent to achieve a desired purpose above and beyond the mere general intent to do the erroneous act.

\* \* \*

What is encompassed by intentional misconduct, therefore, is not the mere general intent to do the act but, additionally, the special intent to attain some specific end thereby.

*Id.* at 633–34, 451 A.2d 1228.

Judge Moylan went on to identify five "special intents" that might flow from the same general intent:

1. thinking it to be correct;

2. not thinking about whether it is error or not (perhaps lawyerly negligence);

3. being cavalierly indifferent to error under circumstances where one would reasonably be expected to know that there is probably error (perhaps gross negligence);

4. knowing it to be error, but hoping to get away with it, thereby clinching a probable winner (deliberate "over-kill" in a case the prosecutor has no desire to abort);

5. knowing it to be error, but desiring to "sabotage" a probable loser either 1) by snatching an unexpected victory from probable defeat if not caught, or 2) by getting caught, thereby provoking the mistrial, averting

the probable acquittal and living to fight again another day. (A calculated sabotaging of a perceived "lost cause" in either event; an indifference to whether he is caught or not).

*Id.* at 635, 451 A.2d 1228.

Of the five special intents, only the fifth will bar retrial under *Kennedy. Id.* Although the second, third, and fourth special intents "are increasingly reprehensible," a defendant's redress "is the declaration of the mistrial itself or the appellate reversal of the conviction." *Id.* at 636, 451 A.2d 1228. In expounding upon the underlying reason for this conclusion, Judge Moylan observed:

Many of the prosecutorial errors that trigger mistrials and reversals consist of grossly negligent and even deliberate conduct. The law has never looked upon the declaration of a mistrial and the appellate reversal as mild slaps upon the wrist, but has treated them as rigorous means for redressing even grossly negligent and deliberate misconduct.... When the prosecution suffers a mistrial or an appellate reversal, it is considered to have suffered a stern rebuke in terms of lost days, lost dollars, lost resources of many varieties and the lost opportunity to make the conviction stick. It is only in the Machiavellian situation where the prosecutor deliberately courts a mistrial, that the normal sanctions are self-evidently inadequate.

*Id.*

Based on the record, which we have reviewed on several occasions, it is evident that the prosecutor's improper conduct at trial was not prompted by a desire to " 'sabotage' a probable loser." *Id.* at 635, 451 A.2d 1228. If we consider the special intents provided in the *West* opinion as a scale, the prosecutor's conduct in this case, at worst, fell in the category of "knowing it to be error, but hoping to get away with it." *Id.* Indeed, we noted in *Hagez I* that the prosecutor had acted zealously to secure a conviction. We also suggested that the blame did not rest solely on the prosecutor; the trial judge permitted the prosecutor's zeal to interfere with the appel-

lant's right to a fair trial. That hardly equates with a deliberate effort by the State to abort the trial.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

Concurring Opinion by MOYLAN, J.

MOYLAN, Judge, concurring.

I fully concur in the decision reached by the majority opinion that the Double Jeopardy Clause of the Fifth Amendment was not offended in this case and that the decision of the Circuit Court for Howard County should, therefore, be affirmed.

I write separately to stress the point that the discussion in the majority opinion of prosecutorial misconduct, or what Supreme Court mistrial-retrial law refers to as "prosecutorial (or judicial) overreaching," is completely in the subjunctive mood. I do not disagree with anything said in the course of that hypothetical discussion. I simply emphasize that the discussion is completely hypothetical. I would have no qualms if I thought that all will read the opinion as carefully and meticulously as it has been written. My fear is that they will not.

The small pocket of double jeopardy law that deals with judicial or prosecutorial overreaching has pertinence only in the exclusive context of a mistrial-retrial situation. This is not such a situation. The first trial of the appellant in this case ended with a guilty verdict. On appeal, that judgment of conviction was reversed. The reason for the reversal was not the legal insufficiency of the evidence.

When a criminal conviction is reversed for any reason other than the legal insufficiency of the evidence, the Double Jeopardy Clause never bars a retrial. The only occasion when a retrial is not permitted by the Double Jeopardy Clause is when the reversal was based on the legal insufficiency of the evidence. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141,

57 L.Ed.2d 1 (1978). In *Oregon v. Kennedy,* 456 U.S. 667, 676 n. 6, 102 S.Ct. 2083, 2090 n. 6, 72 L.Ed.2d 416, 425 n. 6 (1982), the Supreme Court was emphatic in this regard:

> This Court has consistently held that *the Double Jeopardy Clause imposes no limitation upon the power of the government to retry a defendant* who has succeeded in persuading a court to set his conviction aside, *unless the conviction has been reversed because of the insufficiency of the evidence.*

(Emphasis supplied).

In *United States v. DiFrancesco,* 449 U.S. 117, 131, 101 S.Ct. 426, 434, 66 L.Ed.2d 328, 341–42 (1980), the Court was equally clear:

> *[I]f the first trial has ended in a conviction, the double jeopardy guarantee* "imposes no limitations whatever upon the power to retry a defendant who has succeeded in getting his first conviction set aside." "It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction." "[T]o require a criminal defendant to stand trial again after he has successfully invoked a statutory right of appeal to upset his first conviction is not an act of governmental oppression of the sort against which the Double Jeopardy Clause was intended to protect." *There is,* however, *one exception to this rule: the Double Jeopardy Clause prohibits retrial after a conviction has been reversed because of insufficiency of the evidence.*

(Citations omitted; italicized emphasis in original; other emphasis supplied).

That is all the double jeopardy law there is that applies to this case and it is fully dispositive. The appellant's first trial ended in a conviction. That conviction was reversed for a reason other than the legal insufficiency of the evidence. There is, therefore, no double jeopardy bar to a retrial. That is all that needs to be said.

What then is the danger I fear from the gratuitous, albeit quite accurate, discussion of prosecutorial misconduct or prosecutorial overreaching in this case? It is that the line may inadvertently be blurred between two distinct species of double jeopardy law that have nothing to do with each other.

Double jeopardy law is not a doctrinal monolith. It is a generic or umbrella term. The genus "Double Jeopardy" now embraces, at times uncomfortably, three separate and distinct species of law, only one of which was traditional double jeopardy law and only one of which triggers traditional double jeopardy rules and principles. The genus now embraces: 1) traditional double jeopardy law, which never comes into play until an actual verdict has been rendered (the pleas in bar of *autrefois acquit* and *autrefois convict*); 2) mistrial-retrial law, which crept into double jeopardy law in *Wade v. Hunter*, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949), by what Justice Lewis Powell characterized as "the product of historical accident;"[1] and 3) collateral estoppel law, a third and totally distinct body of law that was only added to the "Double Jeopardy" genus by *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). These totally distinct species of law have different histories, serve different purposes, are triggered by different events, and are implemented by different rules and procedures. They should not be confused with one another, and that is what I fear the very discussion in this case may serve to do.

Whereas the twin purposes served by traditional double jeopardy law are 1) to prevent the continuing harassment of a defendant who has once been acquitted (*autrefois acquit*) and 2) to prevent the multiple punishment of a defendant who has once been convicted (*autrefois convict*), the very different purpose served by mistrial-retrial law is to protect the right of a defendant to have the tribunal that is once impaneled to hear his case remain together until a verdict is reached. When a mistrial is declared at the request of the prosecution

---

1. In his dissenting opinion in *Crist v. Bretz*, 437 U.S. 28, 34, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978).

or by a judge *sua sponte,* that right has been interfered with and a retrial will not be permitted unless there was a "manifest necessity" for the mistrial.

When, on the other hand, the mistrial is requested by the defendant, that request has historically been deemed to be a waiver of any objection to a retrial. It was only as an exemption from the otherwise foreclosing effect of such a waiver that the very subject of judicial or prosecutorial overreaching was first recognized by the Supreme Court in *dicta* in the case of *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). The suggestion was that if the defendant was deliberately goaded by prosecutor or judge into requesting a mistrial and that if the goading was for the deliberate purpose of sabotaging a trial that was going badly for the State, the defense request for a mistrial, under those limited circumstances, would not be deemed a waiver. Thus, the entire subject of "judicial or prosecutorial overreaching" pertains only to this exemption from waiver in the limited context where 1) the defendant has requested a mistrial and 2) the mistrial has actually been granted. Beyond that limited context, the entire subject of judicial or prosecutorial overreaching is immaterial.

There was no mistrial in this case and the unique body of law designed to deal only with mistrial-retrial situations is, therefore, totally inapplicable. *A fortiori,* that arcane subdivision of mistrial-retrial law dealing with judicial or prosecutorial overreaching, as an exemption from a waiver, is similarly inapplicable.

To be sure, the majority opinion does not state that that distinct body of law is applicable to the situation before us. It simply hypothesizes that even if, *arguendo,* that body of law did apply, it would still avail the appellant naught. I fear, however, that although the opinion is written in the subjunctive mood, it will be read by some in the declarative mood and that the waters will thereby be muddied.

I write separately to stress the point that this opinion does not stand for, and should not be cited for, the proposition that

prosecutorial overreaching, minimal or maximal, inadvertent or deliberate, for any purpose whatsoever, can ever bar a retrial in a case where the first trial ended in a verdict rather than in the declaration of a mistrial.